

# SUPREME COURT OF MISSOURI
## en banc

VINCENT McFADDEN,               )     *Opinion issued April 14, 2020*
                                )
    Appellant,            )
                                )
v.                              )     No. SC97737
                                )
STATE OF MISSOURI               )
                                )
    Respondent.           )

### APPEAL FROM THE CIRCUIT COURT OF ST. LOUIS COUNTY
**The Honorable David Lee Vincent III, Judge**

Vincent McFadden appeals the circuit court's judgment overruling his Rule 29.15 motion for postconviction relief from his death sentence for the first-degree murder of Todd Franklin ("Victim"). He claims the circuit court committed multiple errors affecting the guilt, penalty, and postconviction relief phases of his case. McFadden asserts, among other claims, that the circuit court erred in failing to find defense counsel ineffective for: (1) calling Michael Douglas ("Codefendant") to testify during trial, (2) failing to present evidence of Victim's bad character during the penalty phase, and (3) failing to object to the State's introduction of letters exchanged between McFadden and Codefendant. Because the circuit court's findings of fact and conclusions of law are not clearly erroneous, the judgment denying postconviction relief is affirmed.

## Background

McFadden was charged with first-degree murder and armed criminal action. The evidence, viewed in the light most favorable to the verdict,[1] demonstrated that Victim and his friend, Mark Silas, were walking in Pine Lawn when they encountered McFadden and Codefendant. McFadden and Codefendant asked Victim if he had a gun; Victim responded that he did not. Codefendant then pulled out a gun and fired a shot, and Victim and Silas ran across the street to Victim's neighbor's yard. McFadden and Codefendant followed.

Codefendant then shot Victim twice, and Victim fell to the ground. McFadden took the gun from Codefendant, walked toward Victim, kicked him, and uttered derogatory phrases. McFadden then shot Victim three times. McFadden and Codefendant ran away, and the neighbor called 911. Victim was alive during each of the five shots, but he eventually died at the scene from the wounds.

An investigation ensued, during which a cigar with McFadden's thumbprint was found at the end of the neighbor's driveway, near Victim's body. During an interview shortly after the shooting, Silas identified McFadden as one of the shooters. The neighbor, as well as individuals at the neighbor's house on the day of the shooting, identified McFadden from a photograph lineup as the second shooter. McFadden was arrested 10 months later.

---

[1] *State v. Taylor*, 134 S.W.3d 21, 24 (Mo. banc 2004).

During trial, the defense called Codefendant as a witness. Codefendant testified he had previously stated that he and his brother – and not McFadden – had shot and killed Victim. Codefendant testified that these previous statements were lies and that McFadden was the second shooter. The jury found McFadden guilty of first-degree murder and armed criminal action.

During the penalty phase, the State presented evidence that: McFadden had prior convictions; he killed his girlfriend's sister, Leslie Addison; he attempted to prevent his girlfriend, Eva Addison, from identifying him as her sister's murderer; and he was in possession of 17 bags of crack cocaine at the time he was arrested.

In mitigation, five members of McFadden's family, McFadden's friend, and a St. Louis juvenile officer testified regarding McFadden's childhood and the environment in which he grew up. The defense also called Dr. Wanda Draper, a human development expert, who testified McFadden had developed a "severe disorganized attachment" disorder because he lacked a reliable parental figure during his childhood. She further testified McFadden's environment partially caused his violent behavior.

The jury found five statutory aggravators – four serious assaultive convictions and depravity of mind – and it recommended a sentence of death. The circuit court sentenced McFadden accordingly, imposing the death penalty for first-degree murder and life imprisonment for armed criminal action. This Court affirmed the convictions and sentences on direct appeal. *State v. McFadden*, 369 S.W.3d 727, 755 (Mo. banc 2012).[2]

---

[2] This Court initially reversed McFadden's convictions on direct appeal, *State v. McFadden*, 216 S.W.3d 673, 678 (Mo. banc 2007), and the case was retried.

3

McFadden filed an amended Rule 29.15 motion for postconviction relief, and the circuit court held an evidentiary hearing. The circuit court entered judgment denying McFadden's claims. McFadden appeals.[3]

**Standard of Review**

A circuit court's judgment denying postconviction relief will be affirmed unless its findings and conclusions are clearly erroneous. Rule 29.15(k); *Meiners v. State*, 540 S.W.3d 832, 836 (Mo. banc 2018). Findings and conclusions are clearly erroneous only when "this Court is left with a definite and firm impression that a mistake has been made." *Mallow v. State*, 439 S.W.3d 764, 768 (Mo. banc 2014).

To obtain postconviction relief on the basis of ineffective assistance of counsel, a movant must satisfy the two-prong *Strickland* standard. *Anderson v. State*, 564 S.W.3d 592, 600 (Mo. banc 2018) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A movant must first demonstrate that counsel's performance was deficient. *Id.* Performance is deficient if it fails to rise to the level of skill and diligence that would be demonstrated by a reasonably competent attorney under similar circumstances. *Id.*

A movant must then prove he was prejudiced by counsel's deficient performance. *Id.* at 601. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

---

[3] This Court has jurisdiction because McFadden received a death sentence. Mo. Const. art. V, sec. 10. Many of the arguments now raised are similar to those McFadden asserted on direct appeal and in *McFadden v. State*, 553 S.W.3d 289, 312 (Mo. banc 2018), McFadden's appeal of the denial of postconviction relief from his conviction and death sentence for the first-degree murder of Leslie Addison. Portions of those opinions are incorporated without further attribution.

4

*Id.* Reasonable probability requires "a probability sufficient to undermine confidence in the outcome." *Tisius v. State*, 519 S.W.3d 413, 420 (Mo. banc 2017). In death penalty cases, "a defendant must show with reasonable probability that the jury, balancing all the circumstances, would not have awarded the death penalty." *Id.*

**Analysis**

***I. Alleged Guilt Phase Errors***

*A. The Decision to Call Codefendant to Testify*

McFadden argues his counsel were ineffective in calling Codefendant to testify because, prior to his testimony at trial, Codefendant's plea counsel told McFadden's counsel that Codefendant would never testify contrary to his guilty plea that he and McFadden shot Victim.[4] Despite this information, counsel called Codefendant, who testified he and McFadden shot Victim. McFadden alleges counsel were ineffective for calling Codefendant to testify because (1) Codefendant's testimony was harmful to the defense's case, especially in light of Silas' testimony that he did not see McFadden shoot Victim, and (2) by calling Codefendant to testify, counsel effectively conceded McFadden's guilt.

Although counsel were aware that Codefendant might testify McFadden was the second shooter – testimony that would be harmful to the defense's case – counsel recognized that Codefendant's testimony to that effect could be impeached with his prior inconsistent statements that Codefendant's brother – and not McFadden – was the second

---

[4] The same two counsel represented McFadden in both trials for the murder of Victim.

5

shooter. McFadden argues Silas' testimony sufficiently established that McFadden did not shoot victim, eliminating any need to call Codefendant. But Silas' testimony about this issue was unclear at best. Silas testified at trial that he was walking in Pine Lawn with Victim when they encountered McFadden and Codefendant. The remainder of much of Silas' testimony consisted of claims of lack of memory. At various points, he testified that he did not know if someone was shot and that he simply heard shots and ran. In a recorded statement to police on the day of the incident, Silas reported McFadden was the second shooter. After the jury heard this recording, Silas testified he fabricated this statement in an effort to leave the police station. Accordingly, the record reflects Silas' inconsistent and wavering testimony did not establish that McFadden did not shoot victim.

At the postconviction hearing, counsel testified they believed calling Codefendant would aid McFadden's case, as his testimony was the only way for the jury to hear the theory that Codefendant's brother may have been the second shooter. Indeed, counsel elicited other helpful statements from Codefendant, including testimony that Codefendant entered a plea and did not receive the maximum sentence even though the State was seeking the death penalty for McFadden's role in the same murder. As counsel made an informed, strategic decision to call Codefendant as a witness, the circuit court did not clearly err in finding counsel's decision reasonable. *Johnson v. State*, 333 S.W.3d 459, 467 (Mo. banc 2011).

McFadden also argues that, by calling Codefendant to testify, counsel violated his right to maintain his innocence by effectively conceding guilt. But this claim is not

6

preserved, as it was not raised in his Rule 29.15 motion. *Shockley v. State*, 579 S.W.3d 881, 899 (Mo. banc 2019). As "there is no plain error review in appeals from postconviction judgments for claims that were not presented in the post-conviction motion," this Court cannot address this claim. *Id.*

## B. Failure to Impeach Codefendant with His Rule 24.035 Motion

McFadden argues the circuit court clearly erred in failing to find counsel ineffective for not using Codefendant's *pro se* Rule 24.035 motion to impeach Codefendant's testimony. In that motion, Codefendant asserted he was not present when Victim was shot.

Although the circuit court took judicial notice of Codefendant's Rule 24.035 motion, postconviction counsel failed to ask counsel for an explanation why they did not impeach Codefendant with the motion. It is presumed that counsel's decision not to impeach a witness is a matter of trial strategy. *Barton v. State*, 432 S.W.3d 741, 750 (Mo. banc 2014). Accordingly, McFadden "failed to provide the motion court with any basis for concluding that counsel did not have a strategic purpose." *Helmig v. State*, 42 S.W.3d 658, 676 (Mo. App. 2001).

Further, as the circuit court found, it was reasonable for counsel not to question Codefendant about the motion, as the motion's substance did not support the defense's strategy. The defense sought to prove McFadden's innocence through evidence that Codefendant and his brother killed Victim. A statement by Codefendant that Codefendant was not involved in the shooting would be inconsistent with the defense's position. Although McFadden may be correct that it would have been reasonable strategy

7

for counsel to impeach Codefendant using the motion, "[i]t is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy." *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006).

Because McFadden has failed to overcome the presumption that counsel's decision not to impeach Codefendant was reasonable trial strategy, the circuit court did not clearly err in denying this claim.

### C. Failure to Object to the State's Introduction of Letters Exchanged between McFadden and Codefendant

McFadden argues that the circuit court clearly erred in failing to find counsel ineffective for not objecting to the admission of letters that McFadden and Codefendant exchanged while both individuals were in jail. McFadden asserts the letters written by Codefendant were inadmissible as hearsay and irrelevant evidence. Further, McFadden claims the letters he wrote were inadmissible as irrelevant.

Hearsay is an out-of-court statement offered as "evidence to prove the truth of the matter asserted." *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009). Generally, hearsay is excluded because "the out-of-court statement is not subject to cross-examination, is not offered under oath, and the fact-finder is not able to judge the declarant's demeanor and credibility as a witness." *State v. Link*, 25 S.W.3d 136, 145 (Mo. banc 2000). When a declarant testifies live and under oath, "the dangers of hearsay are largely non-existent." *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006). For this reason, prejudice cannot be found from the admission of hearsay evidence if the

8

declarant "was also a witness at trial, testified on the same matter, and was subject to cross-examination." *State v. Tindle*, 395 S.W.3d 56, 63 (Mo. App. 2013).

When the circuit court admitted the letters into evidence, it expressly ruled the letters could not be read to the jury unless Codefendant testified. Codefendant later testified, during which he admitted exchanging letters with McFadden. Because Codefendant testified at trial regarding the letters and was subject to cross-examination on the matter, McFadden was not prejudiced by the admission of the letters written by Codefendant.

McFadden also asserts both sets of letters were inadmissible because they were irrelevant. To be admissible, evidence must be both logically and legally relevant. *State v. Anderson*, 306 S.W.3d 529, 538 (Mo. banc 2010). Evidence is logically relevant when it "tends to make the existence of a material fact more or less probable." *Id.* Evidence is legally relevant when its probative value outweighs its costs, such as "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* The State asserts the letters were admitted to establish that McFadden was attempting to persuade Codefendant to conceal McFadden's involvement in the shooting, showing McFadden's consciousness of guilt. For example, one of McFadden's letters asked Codefendant to "[j]ust hold fast," and one of Codefendant's letters stated, "[T]ell your lawyer to put me on the stand because I know you wasn't there and I'm willing to testify on your behalf." The letters showed McFadden was communicating with Codefendant, making more probable the State's argument that McFadden persuaded Codefendant to cover up McFadden's involvement in the shooting.

9

McFadden further argues the phrases in the letters suggesting gang affiliation – such as "Love-N-Loyalty;" "Love is love. Loyalty is royalty;" and "Yung Hood" – caused unfair prejudice.  But these phrases are vague in nature and not so prejudicial as to outweigh the letters' probative value.  *See State v. Davidson*, 242 S.W.3d 409, 415 (Mo. App. 2007) ("Where, as here, there is no reference to any specific criminal act committed either by the defendant or by any gang to which the defendant might belong, admission of such a vague reference . . . does not support a claim of reversible error.").  Accordingly, any objection by counsel regarding the relevance of the letters would have been meritless.

Because McFadden has failed to prove that counsel's failure to object to the admission of the letters resulted in prejudice, the circuit court did not clearly err in denying these claims.

### D. Failure to Object to the State's Introduction of Identification and Fingerprint Evidence

McFadden argues the circuit court clearly erred in failing to find counsel ineffective for not objecting to the State's introduction of evidence demonstrating (1) Silas identified McFadden using a photograph on the wall at the police station and (2) fingerprints on a cigar wrapper found at the crime scene matched "on file" fingerprints belonging to McFadden.  McFadden argues this evidence was inadmissible because it created the inference he had a criminal record or was in trouble with the police. "[P]roof of the commission of separate and distinct crimes is not admissible, unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial."  *State v. Shilkett*, 204 S.W.2d 920, 922-23 (Mo. 1947).

10

*1. Failure to Object to Identification Evidence*

At trial, the State played Silas' recorded statement to police, in which he identified McFadden by using the photograph from the police station wall. A police officer and detective also testified Silas used the photograph to identify McFadden. These references to the photograph were not made to indicate McFadden had committed prior bad acts or uncharged crimes. There were no references to the photograph as a "wanted" photograph and no explanation was provided for the photograph's presence. There was no evidence linking McFadden's photograph to other crimes he may or may not have committed. *See State v. Carr*, 50 S.W.3d 848, 857 (Mo. App. 2001) (requiring defendant, who alleged the State's use of the term "mug shots" and reference to photographs on file with the police department indicated prior criminal activity, to demonstrate photographs maintained by the police department were solely of persons who committed prior crimes, or that the average juror believes same, to satisfy burden of involvement in prior criminal activity); *Nunn v. State*, 755 S.W.2d 269, 272 (Mo. App. 1988) (finding an officer testifying he saw defendant's photograph at roll call was not suggestion that defendant had a criminal record when there was no actual evidence of other crimes).

Even if the references to the photograph on the wall demonstrated McFadden committed prior crimes, "otherwise inadmissible evidence may be admitted . . . if it tends to establish . . . the identity of the person charged with commission of the crime on trial." *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011). Because the references to the photograph were for the purpose of identification, there would have been no merit to an objection to the admission of this evidence. *See Clay*, 975 S.W.2d at 135. The circuit

11

court did not clearly err in failing to find counsel were ineffective for not objecting to the State's presentation of evidence that Silas identified McFadden in a photograph on the wall at the police station.

## 2. Failure to Object to the Match of On-file Fingerprints

A fingerprint examiner obtained a fingerprint from a cigar wrapper found near Victim's body. The examiner testified that, after a comparison to prints on file in the Automated Fingerprint Identification System (AFIS), he determined it was a match to McFadden's fingerprints. "Fingerprint cards, in and of themselves, do not constitute evidence of a prior crime." *State v. Morrow*, 968 S.W.2d 100, 111 (Mo. banc 1998). This Court finds the on-file fingerprints in this case to be analogous. The examiner's testimony was neutral. He did not testify that McFadden's fingerprints on file were obtained pursuant to an arrest, conviction of a crime, or negative interaction with law enforcement. The examiner merely testified about the procedure used.

Because the evidence of the on-file fingerprint was referenced in the context of explaining the procedure for the match and did not, absent something more, raise an inference of prior criminal activity, there would have been no merit to the objection. The circuit court did not clearly err in failing to find counsel ineffective for not objecting to evidence that the fingerprint found at the murder scene matched one of McFadden's on-file fingerprints.

12

## II. Alleged Penalty Phase Errors

### A. Failure to Introduce Certain Evidence Regarding Victim's Bad Character

During the penalty phase, the State offered testimony by Victim's mother, girlfriend, and sister, all of whom portrayed Victim as an upstanding individual. McFadden argues the circuit court clearly erred in failing to find counsel ineffective for not presenting certain evidence to rebut this portrayal of Victim. As a result of the absence of certain rebuttal evidence, McFadden claims the jury believed him to be more deserving of the death penalty. Specifically, McFadden argues counsel should have obtained and introduced a copy of Victim's guilty plea to the felony of second-degree drug trafficking. He further argues counsel should have called Tanesia Kirkman-Clark to testify.

### 1. Victim's Guilty Plea Court Record

At the postconviction evidentiary hearing, McFadden submitted a certified court record, which indicated that Victim had pleaded guilty to second-degree drug trafficking for possessing six or more grams of cocaine base. Although introduction of this record would have rebutted the evidence of Victim's good character by demonstrating his involvement with drugs, counsel were not ineffective for failing to present evidence that was cumulative to other evidence presented at trial. *Forrest*, 290 S.W.3d at 709. During trial, counsel presented evidence that Victim possessed cocaine at the time of his death and further emphasized this point during closing argument. During the cross-examinations of Victim's mother and girlfriend, counsel elicited that both witnesses were unaware of Victim's involvement with drugs.

13

Although evidence that Victim possessed cocaine is not the equivalent of evidence of a second-degree drug trafficking conviction, McFadden has failed to prove there is a reasonable probability that the jury – which heard evidence regarding Victim's history of cocaine possession – would not have recommended the death penalty had Victim's conviction record been admitted into evidence. For this reason, the circuit court did not clearly err in denying McFadden's ineffective assistance of counsel claim for counsel's failure to present evidence of the guilty plea court record.

## 2. Kirkman-Clark's Testimony

McFadden next argues the circuit court clearly erred in failing to determine counsel were ineffective by not calling Kirkman-Clark to testify. To prevail on a claim of ineffective assistance of counsel for failure to call a witness during the penalty phase of trial, a movant must establish, among other requirements, that "the witness could be located through reasonable investigation." *Barton*, 432 S.W.3d at 757. McFadden argues *Gennetten v. State*, 96 S.W.3d 143, 148 (Mo. App. 2003), in which the court held counsel ineffective for failing to locate and present an expert witness who would have presented a viable defense for movant, is analogous. But *Gennetten* can be distinguished on its facts, as counsel in that case did not attempt to contact or locate the witness at all. *Id.* at 151. Here, counsel testified they attempted to contact and locate Kirkman-Clark but were unsuccessful. As McFadden did not prove that Kirkman-Clark could have been located through reasonable investigation, he failed to demonstrate counsel were deficient in their attempt to locate Kirkman-Clark.

14

Even if Kirkman-Clark could have been located through reasonable investigation, McFadden has failed to demonstrate he was prejudiced by counsel's failure to call her as a witness. Because McFadden is arguing counsel were ineffective in failing to call a witness during the penalty phase, "a 'viable defense' is one in which there is a reasonable probability that the additional mitigating evidence those witnesses would have provided would have outweighed the aggravating evidence presented by the prosecutor resulting in the jury voting against the death penalty." *Deck*, 381 S.W.3d at 346.

McFadden asserts Kirkman-Clark would have rebutted evidence of Victim's good character through her testimony that Victim dealt drugs, carried a gun, and was involved in a drive-by shooting. In her deposition, Kirkman-Clark testified that Victim sold drugs, which she learned by witnessing him receive a phone call and observing another individual waiting for him. As these facts alone do not establish that Victim was selling drugs, Kirkman-Clark's testimony to that effect would have been an inadmissible, speculative conclusion. *See State v. Boyd*, 706 S.W.2d 461, 465 (Mo. App. 1986) ("[T]he general rule provides that a lay witness must be restricted to statements of fact, not opinions or conclusions."). Kirkman-Clark further testified she had heard Victim was involved in a drive-by shooting of her mother's house. As Kirkman-Clark recognized during her deposition, this testimony would have been inadmissible hearsay. *See Tisius*, 519 S.W.3d at 422. Accordingly, testimony by Kirkman-Clark that Victim was a drug dealer and was involved in a drive-by shooting would have been inadmissible, and counsel is not ineffective for not presenting inadmissible evidence. *Id.*

15

McFadden has failed to establish the remainder of Kirkman-Clark's testimony would have produced a viable defense. Although she testified Victim carried a gun, she later stated the gun was only for protection. Her testimony actually could have negatively impacted McFadden's defense, as she repeatedly emphasized Victim's good character, maintaining that he "was nice," "respectable" and "liked to . . . make people laugh." As Kirkman-Clark's testimony would have had only minimal probative value in demonstrating Victim's violent tendencies and bad character, the circuit court did not clearly err in determining there was not a reasonable probability that McFadden would not have received a death sentence had she testified.

### B. Failure to Call Additional Expert and Lay Witnesses in Mitigation

McFadden argues the circuit court clearly erred in failing to find counsel ineffective for not calling four additional lay witnesses and two additional expert witnesses.

When representing a defendant in a death penalty case, "trial counsel has an obligation to investigate and discover all reasonably available mitigating evidence." *Davis v. State*, 486 S.W.3d 898, 906 (Mo. banc 2016). Such mitigating evidence may include "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). At the same time, the duty to investigate does not require counsel "to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good

16

reason to think further investigation would be a waste." *Strong*, 263 S.W.3d at 652

(quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)).

At the postconviction hearing, counsel testified the defense's mitigation theory

was that McFadden grew up in a bad neighborhood with a home environment that lacked

guidance and support. During the penalty phase at trial, counsel called seven lay

witnesses, each of whom emphasized the difficulties McFadden experienced growing up

in Pine Lawn. Two of McFadden's aunts and an uncle testified he was a smaller-sized

child who was bullied by other children at school and in the neighborhood. McFadden's

father testified that, when McFadden was around seven years old, he often had bruises,

black eyes, and scratches. McFadden's grandmother testified that he did not have a

consistent home and stayed with various family members. Lynette Hood, a friend of

McFadden's who lived in Pine Lawn, testified that Pine Lawn is a violent neighborhood

and that she often heard gunshots. She stated McFadden was shot in the leg, which led to

a decline of his mental health and wellbeing. A St. Louis juvenile officer testified that

Pine Lawn is a "violent," "depressed," and "difficult place" to live. He further stated

McFadden did not have adequate structure in his home life. Counsel also called an expert

witness, Dr. Draper, who testified regarding the effect of McFadden's home and

community life on his development.

*1. Failure to Call Additional Lay Witnesses*

McFadden now claims counsel should have called four additional lay witnesses

who lived in Pine Lawn: Kirkman-Clark, Elwyn Walls, Sean Nichols, and Willabea

Blackburn. At the postconviction hearing, they testified that Pine Lawn culture consists

17

of gangs, drugs, and violence. This testimony would have been cumulative to the testimony of the seven lay witnesses and Dr. Draper. "Counsel is not ineffective for not presenting cumulative evidence." *Deck*, 381 S.W.3d at 351. Further, these witnesses would have been subject to potentially damaging cross-examination regarding McFadden's gang involvement and responsibility in creating the violent culture. Accordingly, McFadden failed to demonstrate that, had the additional witnesses been called to testify, their testimonies would have outweighed the potentially aggravating evidence elicited by the State. For these reasons, the circuit court did not clearly err in failing to find counsel ineffective for not calling these additional lay witnesses.

### 2. Failure to Call Dr. White

McFadden also claims counsel were ineffective in failing to call Dr. Norman White, or another sociologist with similar expertise, to testify regarding how the cultural environment in which McFadden grew up impacted his development. McFadden also argues counsel were ineffective in failing to provide Dr. Draper with Dr. White's report.

Postconviction counsel asked Dr. White to study Pine Lawn to gain an understanding of McFadden's life as an adolescent in the 1980s and 1990s. Dr. White reviewed Dr. Draper's report, watched a video compilation of interviews addressing life in Pine Lawn, read Pine Lawn newspaper clippings, and interviewed Pine Lawn residents.

Although Dr. White's testimony would have further supported the defense's mitigation theory, Dr. White was unable to opine how growing up in Pine Lawn actually impacted McFadden's decision to murder Victim. Because the defense presented ample

18

evidence of the Pine Lawn culture and its effects on McFadden's childhood and development – including testimony by another expert, Dr. Draper – additional expert testimony on this topic would have been of limited assistance.  *See Deck*, 381 S.W.3d at 351.

As for McFadden's claim that counsel were ineffective in failing to provide Dr. Draper with Dr. White's report, counsel testified at the postconviction hearing that Dr. Draper never indicated she needed additional information to inform her opinion. Further, the record indicates that, even if Dr. Draper had reviewed Dr. White's report prior to testifying at trial, her testimony would not have substantively changed.   At trial, Dr. Draper testified the violent environment in which McFadden lived impaired his ability to make decisions.  Similarly, at the postconviction hearing, Dr. Draper testified the environmental factors identified by Dr. White, such as crime and violence in the community, had an adverse effect on McFadden's development.  Dr. Draper's opinion that McFadden used his free will to kill multiple people did not change after reviewing Dr. White's report.  Because McFadden failed to demonstrate that introduction of Dr. White's findings into evidence – either through Dr. White's own testimony or through furnishing his report to Dr. Draper – would have produced a viable defense, the circuit court did not clearly err in failing to find counsel ineffective for not introducing Dr. White's findings into evidence.

### 3. Failure to Call Dr. Gelbort

McFadden similarly argues the circuit court clearly erred in failing to find counsel ineffective in not calling Dr. Gelbort, or a similarly qualified neurological expert, to

testify regarding McFadden's mental capacity. McFadden argues Dr. Gelbort's testimony should have been presented to support a pretrial motion or, alternatively, to support the defense's argument during the penalty phase that the jury was required to find McFadden was mentally at least 18 years old before sentencing him to death.

To the extent McFadden argues a mental age of younger than 18 entitles him to be treated as a juvenile for sentencing purposes and precludes imposition of the death penalty, despite that he was 23 years old at the time he committed the murder, this Court has rejected that argument. *See Tisius*, 519 S.W.3d at 430-31. *Tisius* held that even though the United States Supreme Court "recognized the potential for a defendant's mental age to differ from his or her biological age," it "nonetheless, implemented a bright line rule as to the minority age for imposition of the death penalty" and "trial counsel were not ineffective for failing to object on grounds that [the defendant's] mental age prohibited imposition of the death penalty." *Id.* at 431. Accordingly, even if counsel had called Dr. Gelbort to testify regarding McFadden's mental capacity, his testimony could not have affected McFadden's death penalty eligibility, as McFadden incorrectly suggests.

To the extent McFadden argues counsel were unreasonable in deciding not to call Dr. Gelbort as an expert during the penalty phase, his claim also fails. In 2004, counsel asked Dr. Gelbort to conduct a neuropsychological evaluation of McFadden. Dr. Gelbort testified the results indicated McFadden had brain abnormalities affecting his ability to solve problems, make decisions, and excel academically.

Dr. Gelbort testified in the first trial involving the murder of Victim as well as the trial involving the murder of Leslie. According to counsel, Dr. Gelbort's testimony was not particularly helpful in those cases, as he had "extremely bad" demeanor on the witness stand and lost credibility with the jury. Further, Dr. Gelbort was unable to testify that McFadden's brain abnormalities caused him to kill Victim, and, in both cases, the juries recommended death. Counsel testified they made a strategic decision not to call Dr. Gelbort as an expert again, concluding the negative impact of Dr. Gelbort's poor demeanor outweighed any potential benefit of his testimony. Instead, counsel chose to call Dr. Draper as well as lay witnesses to testify regarding the effect of Pine Lawn culture on McFadden's development. Such "strategic choices made after thorough investigation of law and facts relevant to plausible opinions are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Counsel reasonably chose not to pursue a strategy that had failed in prior trials, *Baumruck v. State*, 364 S.W.3d 518, 536 (Mo. banc 2012), and instead chose "to pursue one reasonable trial strategy to the exclusion of another." *Davis*, 486 S.W.3d at 912. For these reasons, the circuit court did not clearly err in failing to find counsel ineffective for not calling Dr. Gelbort as a witness.

*C. Failure to Present Brain Scan Evidence*

McFadden argues counsel were ineffective in failing to order a PET (positron emission tomography) scan of his brain and in failing to call Dr. Ruben Gur, a clinical psychologist, to testify about the scan's results.

At the postconviction hearing, counsel testified McFadden underwent an MRI scan, which came back normal. Dr. David Preston, a medical doctor working with

21

counsel at the time, then recommended ordering a PET scan. Counsel testified they considered arranging a PET scan but were unaware of any experts who forensically interpreted the scans, as the medical community at that time was opposed to the use of PET scans in criminal cases. Even if counsel had identified a place to have a PET scan performed, counsel testified they were hesitant to order the scan due to the concern that it was impossible to do so without the State knowing, and any "normal" result could be used against McFadden. These concerns were valid reasons to avoid pursuing the scan. *See Forrest*, 290 S.W.3d at 709 (holding counsel was not ineffective for failing to obtain a PET scan based on fears that the scan would not be "*ex parte* and under seal" and potentially would "provide[] harmful information that would undermine other mitigating evidence").

Further, the record indicates any potential benefit obtained from conducting a PET scan would have been negligible. During the postconviction hearing, Dr. Gur testified regarding a PET scan he performed on McFadden years after the murder. According to Dr. Gur, the scan showed abnormalities indicating McFadden likely had difficulty controlling an emotional response when "challenged or threatened." But during cross-examination, Dr. Gur conceded that the abnormalities in McFadden's scan were not necessarily related to his decisions to kill others and that not all individuals with similar abnormalities are murderers. As this Court stated in *Zink v. State*, 278 S.W.3d 170, 182 (Mo. banc 2009), "the mitigating value of the PET scan evidence is limited because . . . there is no generally accepted scientific link between [a movant's] brain abnormalities and his diagnosed personality disorders."

22

As counsel's time and resources are limited, "if there is a strategy that does not look promising, he may choose not to expend his limited resources to that end." *Id.* at 181. Here, counsel balanced the potential risks of ordering a PET scan with the minimal potential benefits, and the circuit court did not clearly err in finding counsel's decision not to order the scan reasonable.

*D. Failure to Present Evidence Rebutting that McFadden Previously Committed Assaults*

McFadden argues the circuit court clearly erred in failing to find counsel ineffective for not rebutting aggravation evidence, which showed that McFadden was previously convicted of two counts each of first-degree assault and armed criminal action for attacking Daryl Bryant and Jermaine Burns. Specifically, McFadden asserts counsel should have: (1) called Butch Johnson, an investigator with the public defender's office, to testify; (2) presented evidence of Bryant's medical records; and (3) presented evidence of Codefendant's affidavit.

*1. Failure to Call Johnson*

McFadden argues Johnson should have been called to rebut police report statements regarding how the assaults occurred. Occupants of a van in which Bryant and Burns were passengers told police that McFadden shot at them while standing at the front of the van. But Johnson testified at his deposition that the location of the bullets indicated the shooter stood at the back of the van. Importantly, Johnson's testimony regarding the location of the shooter would not have established that McFadden was not the shooter. Further, his concessions during cross-examination undermined his conclusion that the shooter stood at the rear of the van, as Johnson agreed at least one of

23

the two bullets found could not have been fired from the van's rear. The circuit court concluded Johnson was not qualified to give opinions regarding the evidence in the assault case because "[h]is observations, conclusions, and opinions were based on personal speculation rather than physical evidence." This Court "defers to the motion court's superior opportunity to judge the credibility of witnesses." *Barton*, 432 S.W.3d at 760. As there is not a reasonable probability that Johnson's testimony would have provided McFadden with a viable defense, the circuit court did not clearly err in failing to find counsel ineffective in not calling Johnson to testify.

## 2. *Failure to Present Evidence of Bryant's Medical Records*

McFadden also argues counsel were ineffective for failing to present evidence of Bryant's medical records to undermine any conclusion that Bryant suffered serious physical injury as a result of the assault. But there was no question the wound was substantial and required hospital treatment. The medical records confirmed that Bryant received a prescription for "severe" pain and that he was discharged with crutches. Further, an injury need not be serious to constitute felony assault. Even if the medical records supported the conclusion that the injury was not severe, introducing them into evidence would not have impacted the jury's finding that McFadden was convicted of two counts of felony assault. *See State v. Kinder*, 942 S.W.2d 313, 332 (Mo. banc 1996) ("[F]or purposes of evaluating a statutory aggravator, the determination of whether a prior conviction is a serious assault is a matter of law for the court, and the jury only finds as a matter of fact that a prior conviction actually occurred."). For these reasons,

24

the circuit court did not clearly err in failing to find counsel ineffective for not presenting evidence of Bryant's medical records.

### 3. Failure to Present Evidence of Codefendant's Affidavit

McFadden asserts counsel should have presented evidence of Codefendant's affidavit, in which Codefendant indicated that his brother – and not McFadden – assaulted Bryant and Burns. At the evidentiary hearing, counsel testified they were concerned the jury would view this evidence unfavorably, as the jury heard and rejected similar evidence during the guilt phase. According to counsel, such evidence would have actually been aggravating because "[i]t makes it look like Vincent McFadden just blames everything on someone else."

Counsel testified that, as a matter of strategy, they wanted to limit evidence of the prior assault convictions, as the State could have put on even more prejudicial and inflammatory evidence to support the convictions. The circuit court did not clearly err in finding counsel used reasonable trial strategy in deciding not to present evidence of Codefendant's affidavit.

### E. Failure to Present Additional Evidence to Impeach Eva Addison's Testimony

McFadden argues the circuit court clearly erred in failing to find counsel ineffective in the penalty phase for not calling several additional lay witnesses and failing to present photographs and measurements of the crime scene to impeach Eva Addison's testimony that she saw McFadden kill her sister, Leslie Addison. Eva testified that, before McFadden killed Leslie, McFadden confronted Eva and argued with Leslie at Maggie Jones' house. McFadden left in a vehicle, and Leslie walked away from Jones'

25

house because she was scared. Eva testified she eventually observed McFadden get out of the vehicle, approach Leslie, and shoot her. Eva then ran back to Jones' house.

"Ordinarily, the failure to call a witness will not support an ineffective assistance of counsel claim because the choice of witnesses is presumptively a matter of trial strategy." *Tisius*, 519 S.W.3d at 427. This presumption applies to counsel's decision not to impeach a witness. *Barton*, 432 S.W.3d at 750. "A trial strategy decision may only serve as a basis for ineffective counsel if the decision is unreasonable." *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012). As McFadden is again claiming counsel were ineffective in failing to call certain witnesses during the penalty phase, "a 'viable defense' is one in which there is a reasonable probability that the additional mitigating evidence those witnesses would have provided would have outweighed the aggravating evidence presented by the prosecutor resulting in the jury voting against the death penalty." *Deck*, 381 S.W.3d at 346. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

### 1. Failure to Call Jones

If called, Jones would have testified that she did not hear the Addisons and McFadden fighting on the night Leslie was murdered and that Eva did not tell her they had been fighting. McFadden argues this would have impeached Eva's claim that she fought with McFadden outside the house the night Leslie was murdered.

Counsel testified they made the strategic decision not to call Jones at this trial because whether Eva and McFadden fought the night of Leslie's murder was not a key

26

issue in this case. Further, Jones' testimony was only marginally persuasive because she admitted she was in her bedroom the entire evening watching television, making it possible that she would not have heard the fighting. Jones' testimony could have actually bolstered other aspects of Eva's testimony, as Jones testified that the night Leslie was murdered she spoke with Eva, who told her she had seen McFadden shoot Leslie multiple times. As Jones's testimony would have actually supported Eva's testimony that McFadden killed Leslie, McFadden has failed to demonstrate her testimony would have produced a viable defense. *See Deck*, 381 S.W.3d at 346.

### 2. Failure to Call Jackson

McFadden also contends counsel were ineffective in failing to call his friend, Arnell "Smoke" Jackson. At a deposition, Jackson testified he was riding in a car near Jones' home before Leslie was killed. When he saw McFadden leave Jones' home, he followed McFadden and never saw him get out of the car or shoot Leslie. But Jackson stopped following McFadden after the car McFadden was in turned the other way, and Jackson conceded he did not know what actions McFadden took after this point.

As counsel concluded, Jackson "didn't have anything helpful to say," as his testimony would not have undermined Eva's testimony that McFadden shot Leslie. On the contrary, Jackson's testimony would have corroborated Eva's testimony by placing McFadden at the crime scene. Further, Jackson would have been especially vulnerable to impeachment based on his lengthy criminal record – including murder – as well as his friendship with McFadden and admission he tried to persuade McFadden to leave Jones' house because McFadden was wanted for Victim's murder. The circuit court did not

27

clearly err in finding defense counsel used a reasonable trial strategy in deciding not to call Jackson as a witness. *Strickland*, 466 U.S. at 690.

### 3. Failure to Call Walsh

Margaret Walsh is the technician who performed blood analysis testing on the clothing McFadden was wearing when he was arrested for Leslie's murder. McFadden claims Walsh's failure to find blood on his clothes, when Leslie was shot at close range, weakens Eva's testimony that he shot Leslie. But McFadden was not arrested until two days after the shooting, and Walsh admitted she did not know whether the items she tested were actually worn by McFadden at the time of Leslie's murder. Counsel testified at the postconviction hearing that, after considering the limited impeachment value, they decided against calling Walsh as a witness. The circuit court did not clearly err in finding defense counsel used a reasonable trial strategy in not calling Walsh, absent a showing McFadden was wearing the same clothes at the time of shooting or had not washed them.[5]

---

[5] McFadden cites *Black v. State*, 151 S.W.3d 49, 56 (Mo. banc 2004), for the proposition that counsel can be found ineffective for failing to impeach witnesses with their prior inconsistent statements about the circumstances surrounding the crime when the defendant's mental state "was the key issue in contention between the parties" and the prior inconsistent statements "related directly to the central issue of whether [the defendant] acted with deliberation or in a fit of rage or out of self-defense." In such circumstances, there is a reasonable probability this would have affected the outcome of the trial because, if believed, the testimony would have negated an element of the crime for which the defendant was convicted. *Id*. at 58. Unlike in *Black*, McFadden fails to identify prior inconsistent statements Eva made and with which she could have been impeached, nor would the impeaching testimony of these three uncalled witnesses have related "directly to the central issue." Rather, and again unlike in *Black*, counsel made a strategic decision not to call additional lay witnesses after weighing their impeachment value against the damaging cross-examination to which they would have been subjected.

## 4. Failure to Present Evidence of Lighting and Distance

McFadden argues counsel were ineffective for failing to present additional evidence of the lighting at the murder scene and the distance between where Eva reported she was standing and the location where the shooting occurred.

Officer Jeff Hunnius, a crime scene investigator, took photographs of the scene the night of the murder. On cross-examination, he testified that there were no streetlights on the side of the street where the shooting occurred and that he had to use the camera's flash when taking photographs. Counsel also elicited that the distance from the stop sign to the intersection where the shooting occurred was 75 feet, meaning Eva's location in the bushes would have been even farther away. Similarly, during cross-examination of a neighbor who heard the shooting, counsel elicited testimony that the neighbor could not tell there was a body on the ground because it was too dark. The neighbor further confirmed there were no streetlights where the shooting occurred.

McFadden now argues counsel should have introduced additional photographs and measurements to further undercut and impeach Eva's claim she could see the murder from the bushes. In support, at the postconviction hearing, McFadden presented the deposition testimony of Johnson, who took photographs of the area and concluded the lighting was bad. But this testimony would have had little, if any, probative value, as these photographs were taken in daylight 10 years after the murder, and Johnson was unable to testify the lighting and other aspects of the scene had not changed. Further, counsel testified they went to the scene of the murder several times, observed the lighting, and determined Eva would have been capable of observing the shooting. As

29

counsel made a strategic decision not to present additional evidence of the murder scene after a thorough investigation of the pertinent facts, the circuit court did not clearly err in finding counsel utilized a reasonable trial strategy. *Zink*, 278 S.W.3d at 178.

### F. Failure to Object to Arguments

McFadden argues counsel were ineffective for failing to object to certain penalty phase arguments made by the State. Specifically, McFadden contends counsel should have objected to arguments that: (1) McFadden would have killed Eva except he was arrested; (2) in an earlier time, the Victim's and Addison families would have been given the opportunity for personal retribution, but, instead, McFadden received a fair trial; (3) the jury should think of the terror that Victim, Victim's mother, Leslie, and Eva felt; (4) McFadden believes in the death penalty; and (5) the jury should hold, hug, and love Victim and Leslie, but "don't let them down."

### 1. Statement that McFadden Would Have Killed Eva

In the State's closing argument in the penalty phase, the State argued: "He threatens to kill Eva. That's aggravating: you're going to kill a witness because she witnesses you killing her sister. He wants to kill her. He just didn't get a chance to kill her because he got caught in St. Charles." McFadden argues this statement was speculative argument that misled the jury. But "[a] prosecutor is allowed to argue the evidence and all reasonable inferences from the evidence during closing arguments." *State v. Brown*, 337 S.W.3d 12, 14 (Mo. banc 2011). The evidence suggested McFadden threatened Eva. Specifically, Eva testified McFadden said he would kill her if she continued to claim McFadden killed Leslie. As the State's assertion was not outside the

30

evidence and was a reasonable inference drawn from the evidence, any objection would have been meritless, and counsel were not ineffective for failing to object.

### 2. Statement Involving Personal Retribution

In the State's rebuttal closing argument, it argued:

> Now, ladies and gentlemen, we live in a civilized society. But there was a time when civil society wasn't so civilized and we would have given the [Victim's family] and the Addison family an opportunity for retribution.
> We would have let them hunt him down like he deserves. But we don't live in that society. We gave him a fair trial. We put on evidence. He had a right to a lawyer, a jury of his peers.

McFadden argues these statements lessened the jury's sense of responsibility for imposing death. But taken as a whole, the State's argument explained that due process rights for defendants have overtaken a previously uncivilized form of retribution. As this Court held in McFadden's direct appeal, "the State did not comment that the victim's family deserved retribution in the form of demanding the death penalty" but instead "explained that as members of a civilized society we engage in preserving the due process rights of a defendant and ensuring a fair trial; we do not seek retribution." *McFadden*, 369 S.W.3d at 751. Again, any objection to this argument would have been meritless, as the prosecutor's statement did not lessen the jury's sense of responsibility for imposing death. Counsel were not ineffective for failing to object to this statement.

### 3. Three Additional Statements

In the State's rebuttal closing argument, the State made the following three statements to which McFadden now alleges counsel were ineffective for failing to object:

31

First: "Think of the terror that Leslie went through. Think of the terror that [Victim] went through. Think of the terror that [Victim's wife], when she came home, went through. Think of the terror that Eva went through when she watched her sister get killed. Think of that."

Second:

That day, those days, those two days in Pine Lawn, there was one juror that was there. And he was the foreman. He didn't have any evidence, any rule of law. There was no trial.
[McFadden], at that time, decided the death penalty was appropriate. Because, ladies and gentlemen, if there's one person that believes in the death penalty in this courtroom, it's [McFadden].

Third: "Ladies and gentlemen, I leave you with [Victim] and Leslie Addison. Hold them. Hug them. Tell them you love them. But most of all, ladies and gentlemen, don't let them down."

As to each of these statements, McFadden alleges the State argued facts outside the record and injected passion, prejudice, caprice, and emotion, prejudicing the jury. But the State argued inferences from evidence presented in this case. *Brown*, 337 S.W.3d at 14. The circumstances present in this case involved emotionally charged facts. "Arguments likely to inflame and excite prejudices of the jury are not improper if they help the jury understand and appreciate evidence that is likely to cause an emotional response." *State v. Rhodes*, 988 S.W.2d 521, 528 (Mo. banc 1999). For this reason, counsel were not ineffective for failing to object to these statements.

32

As each of these statements made during the penalty phase was proper, the circuit court did not clearly err in failing to find counsel ineffective for not objecting to these statements.

### III. Alleged Errors in the Postconviction Relief Phase

*A. Overruling Motions to Compel Codefendant to Answer Deposition Questions*

Codefendant appeared for a deposition and invoked the Fifth Amendment as to all questions asked by counsel. Counsel filed a motion to compel answers to the deposition questions, which the circuit court overruled on the ground that answering the questions would violate Codefendant's Fifth Amendment right not to incriminate himself. McFadden also filed a renewed motion to compel before the evidentiary hearing, which the circuit court overruled. McFadden now argues the circuit court clearly erred in overruling the motions to compel Codefendant to answer deposition questions and, in doing so, denied McFadden the opportunity to adequately prepare for the Rule 29.15 evidentiary hearing.

Under the protections of the Fifth Amendment, an individual cannot be compelled "to provide testimonial evidence against himself which may then be used to prosecute him." *State v. Sanders*, 842 S.W.2d 170, 173 (Mo. App. 1992). When an answer to a posed question would place the witness in "real danger of further incrimination," the witness can validly exercise the privilege. *Id.*

McFadden claims the Fifth Amendment privilege did not apply here because Codefendant had already pleaded guilty to killing Victim. McFadden is correct that "a knowing and voluntary guilty plea waives the protection against compelled

33

self-incrimination as the witness can no longer be incriminated by his testimony about said crime," *id.*, but McFadden fails to prove he was prejudiced by the circuit court's overruling of his motion to compel. Although McFadden indicates what topics would have been covered during Codefendant's deposition,[6] he does not identify how Codefendant's answers to questions concerning these topics would have supported any of his claims. Indeed, it is unclear how Codefendant's answers to these questions would have impacted McFadden's claims at all, as several of the deposition topics were established by other testimony in the record.[7] As McFadden has failed to meet his burden establishing prejudice, *Goodwin v. State*, 191 S.W.3d 20, 26 (Mo. banc 2006), the circuit court did not clearly err in overruling the motions to compel.

### B. Denying McFadden's Requests to Attend the Rule 29.05 Evidentiary Hearing and to Disqualify the Prosecutor

In an amended motion, McFadden requested to be present at the postconviction evidentiary hearing, and the circuit court initially ordered that McFadden be present. The State filed a motion to recall the writ, emphasizing that McFadden had been convicted of murdering two individuals and that he had been sentenced to death for both murders. At

---

[6] McFadden asserts the following topics would have been covered during Codefendant's deposition: (1) Codefendant's guilty plea of murder for killing Victim and 20-year prison sentence; (2) Codefendant's deposition by phone years earlier during which he refused to be sworn; (3) McFadden's letter that was delivered to Codefendant at the jail; (4) Codefendant's Rule 24.035 motion; (5) Codefendant's letter written years earlier to McFadden's attorneys; (6) information regarding perjury charges; (7) Codefendant's discussion with prosecutors before his testimony in the retrial of this case; and (8) the presence of Roderick Jones and "Little Tony" when Victim was shot.

[7] For example, the record indicates: Codefendant pleaded guilty to murdering Victim, he refused to be sworn during a previous deposition by trial counsel, he wrote a letter to trial counsel, and he filed a Rule 24.035 motion.

the hearing on the motion, the State asserted McFadden had previously assaulted a department of corrections guard and St. Louis County jail guard. Postconviction counsel opposed the motion and informed the circuit court she had no knowledge of McFadden assaulting the guards. The State filed a supplement to its motion to recall the writ, conceding there were no records of McFadden's involvement in assaultive incidents with guards at either the jail or department of corrections. The supplement also stated that the department of corrections' records indicated that McFadden physically assaulted another inmate and that McFadden had "multiple conduct violations." The circuit court sustained the State's motion to recall the writ and ordered that McFadden's testimony be submitted by deposition.

Postconviction counsel then moved to disqualify the St. Louis County prosecutor's office, arguing the State's representations that McFadden had assaulted the guards were made for the purpose of prejudicing the circuit court against McFadden. After a hearing, the circuit court overruled the motion. McFadden now argues the circuit court clearly erred in ordering the writ recalled and in overruling the motion to disqualify the prosecutor's office.

"Even when a hearing is granted, not all rights guaranteed to a criminal defendant at trial are extended to the Rule 29.15 hearing." *Edwards v. State*, 200 S.W.3d 500, 515 (Mo. banc 2006). Because a Rule 29.15 motion is a civil proceeding, neither the rule nor the constitution guarantees a movant the right to be present. *State v. Basile*, 942 S.W.2d 342, 362 (Mo. banc 1997); *see also* Rule 29.15(i) ("At any hearing ordered by the court the movant need not be present."). McFadden argues the United States Supreme Court's

35

recognition of the right to effective assistance of postconviction counsel indicates that he must be allowed to attend his hearing to ensure effective assistance. *See Martinez v. Ryan*, 566 U.S. 1 (2012). But this argument is without merit, as "[t]here is no right to effective assistance of counsel at a Rule 29.15 hearing." *Edwards*, 200 S.W.3d at 515; *see also Barton v. State*, 486 S.W.3d 332, 336 (Mo. banc 2016) ("[N]either this Court nor the federal courts have held that this Sixth Amendment right [to counsel] extends to the post-conviction process."). Because McFadden had no right to attend the hearing, the circuit court did not clearly err in sustaining the State's motion to recall the writ ordering McFadden's attendance at the hearing.

As for McFadden's claim that the circuit court clearly erred in overruling the motion to disqualify the prosecutor's office, disqualification of a prosecutor is appropriate when a conflict of interest prohibits the attorney's participation in the underlying case. *State v. Lemasters*, 456 S.W.3d 416, 420 (Mo. banc 2015). A prosecutor's office "must be disqualified if a reasonable person with knowledge of the facts would find an appearance of impropriety and doubt the fairness" of the process. *Id.* at 423. During the hearings, the prosecuting attorneys indicated their belief that McFadden had a history of assaulting jail and prison guards was derived from information received from the St. Louis County jail. Further, in their supplement to the motion, the prosecuting attorneys corrected their earlier statements that McFadden had a history of assaulting jail and prison guards. For these reasons, the record indicates the prosecutor's office was impartial and had no conflict of interest in McFadden's case.

36

There was no appearance of impropriety. The circuit court did not clearly err in overruling McFadden's motion to disqualify the prosecutor's office.

## C. Memoranda of Law Claims

More than four years after filing the amended motion, postconviction counsel filed a memorandum titled "Memorandum Asserting Ineffective Assistance of Counsel for Failure to Investigate and Adduce Evidence of Movant's Brain Deficiencies During the Guilt Phase." In the memorandum, postconviction counsel recognized the two claims regarding Dr. Gur and Dr. Gelbort in the amended motion applied only to the penalty phase but requested those claims also apply to the guilt phase. In response, the State filed a motion to dismiss, asserting the claims alleged in the memorandum were barred because they were not raised in the amended motion. The circuit court sustained the State's motion to dismiss, finding the claims untimely. Several months later, McFadden filed a letter complaining postconviction counsel failed to include these claims in his Rule 29.15 amended motion.

McFadden now asserts two arguments regarding the claims asserted in the memorandum. First, McFadden argues the circuit court clearly erred in treating the claims as untimely. Next, McFadden argues the circuit court clearly erred in failing to find that postconviction counsel abandoned him when postconviction counsel did not include the memorandum claims in the amended motion.

### 1. Failure to Find the Claims Timely

To the extent McFadden argues the Rule 29.15 time limits are unconstitutional, "unreasonably short," and should be reconsidered by this Court, this claim has been

waived, as McFadden failed to make this claim before the circuit court. *See White v. State*, 939 S.W.2d 887, 904 (Mo. banc 1997) ("Since the issue was never raised in the post-conviction proceeding, error by that court, plain, clear, or otherwise, is not discernable.").

To the extent McFadden asserts this Court's rules required the circuit court to find the claims timely, his argument also fails. Rule 29.15 provides that a postconviction relief motion shall be filed within 90 days after the date the mandate of the appellate court issues. The rule also provides a specific timeframe for filing an amended motion. *See* Rule 29.15(g). It is "a time-worn and oft-rejected charge that the mandatory time limits established by Rule 29.15 are unconstitutional." *State v. Ervin*, 835 S.W.2d 905, 929 (Mo. banc 1992). Such time limitations are reasonable and constitutional because "[t]hey serve the legitimate end of avoiding delay in the processing of prisoners['] claims and prevent the litigation of stale claims." *Day v. State*, 770 S.W.2d 692, 695 (Mo. banc 1989). McFadden attempted to amend his claim more than four years after postconviction counsel timely filed the amended motion – long after the deadlines provided in Rule 29.15. Accordingly, the circuit court did not clearly err in finding the added claims were untimely pursuant to Rule 29.15.

*2. Failure to Find Postconviction Counsel Abandoned McFadden*

McFadden next argues the circuit court clearly erred in failing to find postconviction counsel abandoned him by not asserting in the amended motion that the claims regarding Dr. Gur and Dr. Gelbort should apply to the guilt phase.

In general, an abandonment claim is limited to two circumstances, when "(1) post-conviction counsel takes no action on movant's behalf with respect to filing an amended motion" or "(2) when post-conviction counsel is aware of the need to file an amended post-conviction relief motion and fails to do so in a timely manner." *Barton*, 486 S.W.3d at 338. This Court reviews claims of abandonment carefully "to ensure that the true claim is abandonment and not a substitute for an impermissible claim of ineffective assistance of post-conviction counsel." *Eastburn v. State*, 400 S.W.3d 770, 774 (Mo. banc 2013). If a movant claims ineffective assistance of postconviction counsel, such claims are "categorically unreviewable." *Id.*

Because postconviction counsel timely filed an amended Rule 29.15 motion, McFadden's assertion that postconviction counsel failed to include additional claims is "more appropriately characterized as a claim of ineffective assistance of post-conviction counsel." *Id.* As this Court has made clear abandonment does not encompass perceived ineffective assistance of postconviction counsel, *id.*, the circuit court did not clearly err in failing to find abandonment.

**Conclusion**

The circuit court's findings of fact and conclusions of law are not clearly erroneous.  The judgment denying McFadden postconviction relief is affirmed.

_____
Mary R. Russell, Judge

All concur.