Michael F. GENNETTEN, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 60416.

Missouri Court of Appeals,
Western District.

Jan. 31, 2003.

Michael L. McDorman, Versailles, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Adriane Dixon Crouse, Assistant Attorney General, Jefferson City, MO, for respondent.

Before BRECKENRIDGE, P.J., HOWARD and HOLLIGER, JJ.

PATRICIA BRECKENRIDGE, Judge.

Michael F. Gennetten appeals the denial of his Rule 29.15 motion for post-conviction relief following an evidentiary hearing. Mr. Gennetten was convicted after a jury trial of second degree murder, section 565.021, RSMo 2000.[1] The trial court sentenced him to thirty years imprisonment. On appeal, Mr. Gennetten alleges that he received ineffective assistance of counsel, in that his trial counsel failed to investigate and present testimony from three expert witnesses, failed to file a timely discovery request, failed to submit a jury instruction on the lesser-included offense of involuntary manslaughter, and failed to impeach the prosecution's expert witness. This court finds that Mr. Gennetten's trial counsel was ineffective for failing to investigate and call Dr. Ronald Sharp as a witness at trial when Dr. Sharp was available, known to trial counsel, and would have provided a viable defense. Accordingly, the judgment denying his post-conviction motion is reversed, the conviction and sentence are vacated, and the cause is remanded for a new trial. Consequently, this court does not need to consider the issues raised in Mr. Gennetten's remaining points, as they are unlikely to occur on retrial.

**Facts and Procedural History**

On December 9, 1994, Mr. Gennetten and Asia Howell arrived at Bothwell Hospital in Sedalia. Asia, who was fifteen months old, was unconscious, her teeth were clenched, her pupils were fixed and dilated, and her breathing was noisy. Mr. Gennetten told the emergency room nurses that Asia had choked on a French fry and that he may have shaken her too hard in trying to expel it. The hospital personnel did not find any obstructions in Asia's airway, and, after pumping her stomach, they did not find any food particles.

During Asia's examination, a nurse noticed burns on Asia's body and on the tops of her feet, in different stages of healing. Mr. Gennetten told the nurse that the burns on Asia's feet occurred when she fell into the bathtub, wearing socks, while the hot water was running. A CAT scan revealed that blood had accumulated between Asia's brain and skull and she had retinal bleeding in both of her eyes. The doctors did not expect Asia to regain consciousness, so they transferred her to Children's Mercy Hospital in Kansas City for further treatment. Asia was declared dead on December 13, 1994.

Dr. James Berkland, Jackson County medical examiner, performed an autopsy on Asia. He determined that Asia's immediate cause of death was "diffuse extensive cerebral edema as result of closed head trauma, with subdural hematoma and subarachnoid bleeding," which were consistent with shaken baby impact syndrome. He reached the conclusion that her head injuries were consistent with an intentional injury, and were inconsistent with an improperly performed Heimlich maneuver or any other accidental cause. Dr. Berkland also observed burns to Asia's right chest, left back, left and right tops of the feet and formed the belief that the burns upon Asia's body were of three different ages.

Subsequently, the State charged Mr. Gennetten by information with second degree murder, § 565.021, and two counts of assault in the first degree, § 565.050, for knowingly burning Asia's feet and legs on two separate occasions. A jury trial was held from October 16 to October 19, 1995. The prosecutor dismissed the assault charges on the first day of trial.

1. All statutory references are to the Revised Statutes of Missouri 2000.

At trial, the State presented testimony from Dr. Berkland regarding his findings from Asia's autopsy. In addition, Dr. Berkland testified that the burns on Asia's feet were not consistent with submerged burns, which occur when a child is put in hot water, but were instead consistent with an inflicted injury. He testified that the burns had occurred over a period of time, and she had a burn within a burn on her right foot. Based on all of these facts, he concluded that, in his opinion, Asia's death was the result of "fatal child abuse," which he defined as "multiple repeated episodes at different times of intentional inflicted injuries to a child with a subsequent death of the child as a result of one of those injuries."

The State also introduced into evidence Asia's medical records from Bothwell Hospital and Children's Mercy Hospital. Included in the records were the consultation notes of Dr. James Kelly, a doctor who treated Asia at Children's Mercy Hospital. According to Dr. Kelly's notes, Asia suffered from "acute left subdural hematoma," "left severe cerebral edema," "a number of bilateral retinal hemorrhages," "old second and third degree burns of different stages of healing," and "recent bruising to the right side of the neck." Dr. Kelly noted that these "injuries [were] consistent with inflicted intentional pattern of abuse."

Also included in the medical records was the consultation report from the radiology department, signed by Dr. Stacy Stevens, a doctor at Children's Mercy Hospital who had reviewed Asia's CAT scan. In the report, Dr. Stevens noted that the results of Asia's CAT scan "suggests severe anoxic/traumatic brain injury and is inconsistent with a history of accidental trauma." In addition, the medical records included Asia's death summary, which was stamped with Dr. Ronald Sharp's signature. According to the death summary's discharge diagnosis, at the time of her death, Asia suffered from a "severe closed head injury" and "second and third degree burns to lower extremities." The death summary also stated that child abuse was suspected.

Mr. Gennetten presented two medical witnesses in his defense at trial. The first medical witness, Libby Bannister, was a licensed practical nurse who had not personally seen or treated Asia. Ms. Bannister testified about the amount of medication given to Asia based on her review of Asia's medical records. The second medical witness was Dr. Stacy Stevens, the doctor at Children's Mercy Hospital who reviewed Asia's CAT scan and prepared the consultation report admitted into evidence by the State. Dr. Stevens testified that he diagnosed Asia with a subdural hematoma with left cerebral edema. He also testified that the subdural hematoma was less than seven days old and the edema could have been anywhere from less than twelve to twenty-eight hours old. On cross-examination, Dr. Stevens testified that his impression of Asia's injury was that it was "non accidental," meaning it was caused by "child abuse."

Mr. Gennetten also testified on his own behalf and recounted the events of the night of December 9. On direct examination, Mr. Gennetten testified that he was taking care of Kim Howell's children, Asia and Chris, for the weekend. He testified that he had started dating Ms. Howell in the first part of October 1994 and had already taken care of Chris and Asia overnight on at least three occasions since he met Ms. Howell. He claimed that on the night of December 9, after he had put Chris to bed, he and Asia ate dinner in front of the television in the living room. Mr. Gennetten stated he went to the bathroom and, while he was in the bathroom, he heard Asia choking. He claimed he came out of the bathroom and found her

on her hands and knees in front of the bathroom door making choking sounds. Mr. Gennetten testified that he put his fingers in her mouth and down her throat to try to remove the blockage, but he did not feel anything. He said he then picked her up, squeezed her stomach, and hit her several times on her back between her shoulder blades. He testified that Asia finally spit out a chewed-up French fry and some liquid. Mr. Gennetten stated that soon after, he noticed that Asia looked distant and glassy-eyed and was making a rattling noise when she breathed. Mr. Gennetten testified that he called Ms. Howell and then took Asia to the hospital.

Mr. Gennetten testified that he later learned from a Red Cross pamphlet that the method he had used to stop Asia from choking was improper. He further testified that he was not trying to harm Asia when he tried to stop her from choking.

Mr. Gennetten also testified regarding Asia's burns. He stated that while he was watching Chris and Asia on the weekend of November 19, Asia fell into the bathtub, wearing socks, while the hot water was running. He testified that there was no plug in the bathtub, so there was not a lot of water in the bathtub when Asia fell in. He also testified that a towel he had draped on the side of the bathtub fell in with Asia. He further testified that he pulled Asia out of the bathtub and, when he took off her socks, he noticed big white blisters on her feet. He also said that he was not aware of any other burns on Asia's body.

During closing arguments, the prosecutor argued that in determining whether Mr. Gennetten was guilty of second degree murder, the jury should "[r]emember [Mr. Gennetten's] other misconduct with [Asia] in deciding what his intent was." The prosecutor listed all of the evidence about Asia's injuries, emphasizing the burns on

her feet, and repeatedly told the jury to look at all of these injuries to decide Mr. Gennetten's intent on the night of December 9. The jury was instructed, in Instruction No. 7, that it could consider the evidence that the defendant was involved in offenses other than the one for which he was on trial "on the issue of intent and absence of mistake or accident of [Mr. Gennetten]."

At the end of the trial, the jury found Mr. Gennetten guilty of second degree murder. The trial court sentenced Mr. Gennetten to thirty years imprisonment. On April 15, 1997, this court affirmed Mr. Gennetten's conviction in an unpublished opinion. *State v. Gennetten*, 948 S.W.2d 643 (Mo.App.1997).

On November 17, 1997, Mr. Gennetten filed an amended Rule 29.15 motion for post-conviction relief. On August 2, 2001, the motion court denied Mr. Gennetten's motion after an evidentiary hearing. This appeal followed.

### Standard of Review

■ In reviewing a denial of a motion for post-conviction relief, this court is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). Such a finding will be made only if, after a review of the entire record, the appellate court is left with a definite and firm impression that a mistake has been made. *Id.*

■ To prevail on his claim of ineffective assistance of counsel, Mr. Gennetten must meet the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, he must show (1) that his attorney failed to exercise the level of skill and diligence that a reasonably competent attorney would in a similar situation, and

(2) that he was prejudiced by that failure. *Id.* at 687, 104 S.Ct. at 2064. Both prongs of *Strickland* must be met, and if Mr. Gennetten fails to satisfy either prong, this court does not need to consider the other. *State v. Simmons,* 955 S.W.2d 729, 746 (Mo. banc 1997). To establish the performance prong, Mr. Gennetten "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *Id.* To establish prejudice, he must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Moore v. State,* 827 S.W.2d 213, 215 (Mo. banc 1992) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068).

### Trial Counsel Ineffective for Failing to Investigate and Call Expert Witness

■ In his first point on appeal, Mr. Gennetten claims that his trial counsel was ineffective for failing to investigate and call Dr. Ronald Sharp, chief of the burn unit and trauma and critical care at Children's Mercy Hospital and a treating physician of Asia. Specifically, he claims that trial counsel was ineffective for failing to call Dr. Sharp because Dr. Sharp would have testified that Asia's burns were consistent with an accidental injury, which would have corroborated his trial testimony, would have contradicted Dr. Berkland's testimony, and would have provided him with a viable defense that, since Asia's burns were accidentally caused, he had not engaged in a pattern of abuse of her.

■ Under *Strickland,* Mr. Gennetten must prove first that his attorney's performance was not up to the level of skill and diligence that a reasonably competent attorney would exercise in a similar situation. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. When the claim of ineffective assistance of counsel is the failure to locate and present an expert witness, the movant must prove that "such experts existed at the time of trial, that they could have been located through reasonable investigation, and that the testimony of these witnesses would have benefited movant's defense." *State v. Davis,* 814 S.W.2d 593, 603–04 (Mo. banc 1991). Nearly identical factors are applicable to fact witnesses: the movant must prove "(1) the witness could have been located through reasonable investigation; (2) the witness would have testified if called; and (3) the testimony would have provided a viable defense." *Williams v. State,* 8 S.W.3d 217, 219 (Mo.App.1999).

Applying the evidence to these factors, as to factor one, trial counsel testified at the evidentiary hearing that he listed Dr. Sharp as a potential witness in Mr. Gennetten's case. Trial counsel also testified that he reviewed Asia's death summary stamped with Dr. Sharp's signature, but he did not contact Dr. Sharp to determine if "he authorized the placing of his signature on [the] document." Thus, trial counsel knew of Dr. Sharp because he listed him as a potential witness. Trial counsel also could have located Dr. Sharp because he knew through the death certificate that Dr. Sharp worked at Children's Mercy Hospital. Concerning factor two, whether the witness would have testified if called, Dr. Sharp testified at the evidentiary hearing that, if he had been asked in 1995, he "certainly" would have rendered the opinion that Asia's burns were consistent with an accidental injury.

Factor three, the factor the motion court found Mr. Gennetten failed to prove, was

whether Dr. Sharp's testimony would have provided Mr. Gennetten with a viable defense. Dr. Sharp testified at the evidentiary hearing that he has been the chief of the burn unit and trauma and critical care at Children's Mercy Hospital since 1983. Dr. Sharp also testified that he supervised the treatment of Asia Howell in 1994. Dr. Sharp saw and examined the burns on Asia's feet and testified that, in his opinion, the burns occurred at the same time and were "very consistent" with "a small child being subjected to a hot stream of water from a bathtub [while] wearing socks." He testified that based on his examination of Asia, there was no indication that the burns were caused by a deliberate act. In addition, he testified that, in his opinion, the burn on Asia's right foot was not a burn within a burn, evidencing torture. Instead, the burn on her right foot was "a typical example of a skull type injury. You'll have an area there where there's a more intense area of deep second or third degree burn surrounded by an area of superficial second or third degree burn," and that, while the superficial area will heal within ten to fourteen days, the deeper area will remain open. He further testified that this type of burn typically happens with a faucet burn and could occur if burned by hot water while wearing socks.

Dr. Sharp also testified about the death summary that was admitted into evidence by the State at trial as part of the Children's Mercy Hospital records, which included the diagnosis of "suspected child abuse." He testified that, although the death summary bore his stamped signature, a resident prepared it, and he did not review it before his secretary stamped his name on it. He said he disagreed with the death summary because the burns by themselves did not raise a red flag of child abuse, and that, although the head wound and burns would be suspicious of child abuse, that conclusion would be under-

mined if there were some other plausible explanation for the head injury.

From this evidence, it is apparent that Dr. Sharp's testimony would have provided Mr. Gennetten with a viable defense. If called to testify, Dr. Sharp would have stated that, in his opinion, Asia's burns were consistent with accidental, faucet burns and that there was no evidence of a burn within a burn on her right foot. This testimony, if believed, would have supported Mr. Gennetten's defense that Asia's burns occurred when she accidentally fell into the bathtub while the hot water was running, wearing socks, and that he did not intentionally abuse her. Furthermore, if believed, his testimony would have undermined the State's theory that Mr. Gennetten engaged in a pattern of abuse against Asia and, as such, would have provided a viable defense to the intent element of the second degree murder charge.

The motion court, however, found that Dr. Sharp would not have provided Mr. Gennetten with a viable defense because his testimony would have only impeached Dr. Berkland's testimony. Contrary to the motion court's findings Dr. Sharp's testimony would have done more than just impeach Dr. Berkland's testimony; it also would have contradicted it. "Impeachment is directed to the credibility of the witness for the purpose of discrediting him. It ordinarily furnishes no factual evidence. Contradiction, on the other hand, is directed to the accuracy of testimony and supplies additional factual evidence to be considered along with such testimony." *Talley v. Richart*, 353 Mo. 912, 185 S.W.2d 23, 26 (Mo.1945) (internal citations omitted). Here, Dr. Sharp would have provided direct testimony that in his opinion, based on his own observations as Asia's treating physician, her burns were accidentally inflicted and were not consistent with an intentional injury. While his

testimony would have contradicted Dr. Berkland's autopsy findings that Asia's burns were intentionally inflicted, Dr. Sharp would also have presented additional factual evidence to support his conclusion that the burns occurred accidentally.

The motion court also found that Dr. Sharp would not have provided Mr. Gennetten with a viable defense because his testimony might have hurt Mr. Gennetten. The motion court found that although Dr. Sharp *"might"* have provided support for Mr. Gennetten's testimony that the burns on Asia's feet were accidental, it was also "quite apparent" from his testimony that he thought Mr. Gennetten's explanation of how Asia's feet were burned was "highly unlikely." It is true that on cross-examination Dr. Sharp testified that, based just on the photos of Asia's feet, one would have to assume that it was possible that the burns could have been inflicted intentionally. Nevertheless, he repeatedly testified later that the pattern of Asia's burns was not consistent with suspected child abuse and was consistent with an accidental cause. The only aspect about Asia's burns that Dr. Sharp stated was "highly unlikely" was that the burn on her right foot was a burn within a burn. This testimony is favorable to Mr. Gennetten because it undermines the State's theory that Mr. Gennetten tortured Asia by inflicting a burn upon a burn. Moreover, in light of the fact that there was no other testimony besides Mr. Gennetten's that Asia's burns occurred accidentally, Dr. Sharp's expert testimony would have strengthened Mr. Gennetten's defense more than it would have hurt it.

Finally, the motion court found that Dr. Sharp would not have provided Mr. Gennetten with a viable defense because, at the time of trial, the charges regarding the burns had been dismissed. Contrary to the motion court's finding, although the

charges directly related to the burns were dismissed at the beginning of the trial, evidence relating to Asia's burns was still integral evidence of intentional second degree murder or absence of mistake. A person is guilty of second degree murder "if he ... knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person." Section 565.021.1(1). Furthermore, "[e]vidence of prior mistreatment of a child may be considered in establishing the intent required for second degree murder." *State v. Mattingly*, 573 S.W.2d 372, 374 (Mo.App.1978). Here, the State used the burns as affirmative evidence on the issue of Mr. Gennetten's intent because they were the basis of its claims of a pattern of abuse to prove a lack of mistake or accident in Asia's death. The testimony of Dr. Berkland was that he relied upon a belief that the burns were intentionally inflicted to form his opinion that Asia's death resulted from "fatal child abuse," which he defined as "multiple repeated episodes at different times of intentional inflicted injuries to a child with a subsequent death of the child as a result of one of those injuries." The jury was also instructed that they could consider evidence of other offenses on the issue of intent and absence of mistake or accident, and the State argued in its closing argument that the jury should consider the burn evidence when determining the issue of intent. Dr. Sharp's testimony would have undermined the State's theory that Mr. Gennetten engaged in a pattern of abuse against Asia and supported Mr. Gennetten's theory that Asia's burns occurred accidentally. As such, Dr. Sharp's testimony would have negated the State's primary evidence of a pattern of abuse as evidence of Mr. Gennetten's state of mind in causing the Asia's death. This was a viable defense for the second degree murder charge.

Although Mr. Gennetten has met the requirements for proving that trial counsel was ineffective for failing to call an expert witness, he must still show that trial counsel's decision not to call Dr. Sharp was not a matter of trial strategy. "Trial counsel's decision not to call a witness is presumed to be trial strategy unless otherwise clearly shown." *Bucklew v. State*, 38 S.W.3d 395, 398 (Mo. banc 2001). Nonetheless, " '[t]here are numerous cases in which postconviction relief has been granted because of counsel's failure to interview witnesses or to check out leads.' " *Perkey v. State*, 68 S.W.3d 547, 552 (Mo. App.2001) (quoting *Blankenship v. State*, 23 S.W.3d 848, 852 (Mo.App.2000)). This is because " '[c]ounsel has a duty to make reasonable professional investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Moore*, 827 S.W.2d at 215 (quoting *State v. Griffin*, 810 S.W.2d 956, 958 (Mo.App. 1991)). " 'An argument based on trial strategy or tactics is appropriate only if counsel is fully informed of facts which should have been discovered by investigation.' " *Perkey*, 68 S.W.3d at 551 (quoting *Clay v. State*, 954 S.W.2d 344, 349 (Mo. App.1997)). "Strategic choices made after less than a thorough investigation are only reasonable to the extent that reasonable professional judgment would support the choice not to investigate further." *Anderson v. State*, 66 S.W.3d 770, 776 (Mo.App.2002).

Trial counsel has been found ineffective for failing to investigate and call expert witnesses in two cases similar to Mr. Gennetten's. *See Perkey*, 68 S.W.3d 547; *Cravens v. State*, 50 S.W.3d 290, 295 (Mo.App. 2001). In *Perkey*, this court held that failure to present evidence that would "contradict" a material aspect of the prosecutor's medical expert's testimony on issues relating to the victim's cause of death was ineffective assistance of counsel. *Per-*

*key*, 68 S.W.3d at 552. In *Cravens*, the Southern District held the failure to investigate any expert witnesses regarding the distance from which the shot that killed the victim was fired, when the entire defense rested on the theory that the victim was shot from a close range, was ineffective assistance of counsel. *Cravens*, 50 S.W.3d at 295. The court held that trial counsel's decision not to investigate an expert witness was not reasonable because it was based solely on the assumption that the State did not have any witnesses who could testify conclusively as to the distance from which the shot was fired, and not on any independent investigation. *Id.*

Here, Mr. Gennetten's trial counsel did not make a reasonable professional investigation or a reasonable decision not to investigate Dr. Sharp. Trial counsel knew of Dr. Sharp and listed him as a potential witness. Trial counsel did not bother to talk to or investigate Dr. Sharp, however. Trial counsel stated that he did not investigate Dr. Sharp or any expert regarding Asia's burns because he "didn't need them" since there was "no evidence whatsoever where anybody claimed that [Mr.] Gennetten inflicted these burns on that child." Contrary to trial counsel's claim, the State's expert witness, Dr. Berkland, testified that Asia's burns were intentionally inflicted. Additionally, although trial counsel said that he had a letter from Dr. James Kelly, a doctor who treated Asia at Children's Mercy Hospital, that effectively said the burns were not intentionally inflicted, Dr. Kelly clearly states in his letter that Asia's "burns in my opinion are not consistent with accidental burns" and "are consistent with intentional inflicted injuries of a patterned nature over a period of time." Also, at the time trial counsel made the decision not to interview any witnesses regarding the burns, Mr. Gennetten was still charged with two counts of

first degree assault for intentionally burning Asia.

Because trial counsel had a death summary signed by Dr. Sharp, which said that Asia's injuries were "consistent with severe child abuse," trial counsel should have investigated Dr. Sharp. Dr. Sharp was the head of the burn unit and Asia's treating physician and, as such, was a key witness in the case. Trial counsel should have realized that Dr. Sharp was a key witness and he should have had an interest in investigating him. *Clay*, 954 S.W.2d at 347 (holding that a "prudent lawyer" "would be expected" to interview the police officers who investigated his client). If trial counsel had investigated Dr. Sharp, he would have discovered that he had information favorable to the defense. Thus, like in *Perkey* and *Cravens*, trial counsel's decision here that he "didn't need" to investigate any witnesses regarding Asia's burns was not made in the exercise of reasonable professional judgment.

Moreover, the record reveals that trial counsel's efforts to investigate "were perfunctory, at best." *See State v. Butler*, 951 S.W.2d 600, 609 (Mo. banc 1997). He did not file a request for discovery until 167 days after arraignment even though Rule 25.02 sets the deadline at twenty days, unless extended by the court. Trial counsel never requested an extension of the time to request discovery. As a result, the trial court sustained the State's objection to the request and the only discovery he received was what the State voluntarily supplied. Even that discovery was not made until three weeks before trial. The effect of this failure was that, during trial, trial counsel asked for the admission of all the medical records of Asia, even though he had previously been successful in excluding portions of the record. His reason for admitting all of the records, despite the trial court's inquiry about the portions that

were the subject of trial counsel's motion in limine to exclude, was that he had not "seen it before" and he would "kind of like to go browsing through it." A portion of this record was subsequently used by the State to impeach a defense witness, Dr. Stevens.

The failure to request discovery also caused trial counsel not to discover a letter from Dr. Douglas W. Beal to an investigator for the Division of Family Services. In this letter Dr. Beal stated his opinion that Asia's burns were most likely caused by contact with a towel or cloth saturated with hot water and that the burns could have occurred in 1.5 seconds if the water temperature was 150 degrees Fahrenheit. This opinion was consistent with Mr. Gennetten's account of how the burns occurred and with Dr. Sharp's opinion that the burns were accidentally caused.

■ Having found that Mr. Gennetten proved the performance prong of *Strickland*, this court will next consider whether trial counsel's failure to investigate and call Dr. Sharp prejudiced Mr. Gennetten. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. This court has already concluded that Dr. Sharp's testimony would have provided Mr. Gennetten with a viable defense because it would have corroborated Mr. Gennetten's explanation that Asia's burns occurred accidentally and undermined the State's theory of a pattern of abuse. Without Dr. Sharp's testimony, the jury was presented only with expert testimony that Asia's burns were intentionally inflicted and Mr. Gennetten's self-serving testimony that the burns occurred accidentally. If the jury had been presented with Dr. Sharp's expert testimony that supported Mr. Gennetten's testimony, the jury may not have believed that the burns were intentional, which would have significantly undermined the State's theory of a pattern of abuse to support the second

degree murder charge. Thus, Mr. Gennetten was prejudiced because trial counsel's failure to investigate and call Dr. Sharp undermines confidence in the verdict. As a result, there exists a reasonable probability that if the jury had been presented with his testimony, the results of the trial may have been different. *See Moore*, 827 S.W.2d at 215 (holding that defendant was prejudiced by trial counsel's failure to obtain requested blood tests because a reasonable probability existed that the jury could have reached a different result even thought the test results *"may not have changed the result"*). *See also Cravens*, 50 S.W.3d at 296 (holding that defendant was prejudiced by trial counsel's failure to present expert testimony because without it the jury was presented only with the State's theory of how the crime occurred).

The motion court, however, held that Mr. Gennetten was not prejudiced by trial counsel's failure to investigate and call Dr. Sharp because Dr. Sharp's testimony would have hurt Mr. Gennetten. The motion court found that Dr. Sharp's testimony would have hurt Mr. Gennetten because he "testified at the evidentiary hearing that though the burns on Asia Howell's feet were not in and of themselves indicative [of] child abuse, the burns combined with the subdural hematoma 'screamed' of possible child abuse." Dr. Sharp, however, did not testify that the burns and the head injury "screamed" of possible child abuse. Instead, the State used this statement from Dr. Sharp's deposition taken before the evidentiary hearing to impeach his testimony at the hearing. In response, Dr. Sharp agreed that multiple injuries combined with a subdural hematoma, brain swelling, and retinal hemorrhages is a "classic case of shaken baby syndrome" and that this would cause one to be "highly suspect" and to "look further." Nevertheless, Dr. Sharp testified that Asia's burns

were not consistent with an intentional injury, which does not support a "classic case of shaken baby syndrome." This conclusion undermines the State's theory of a pattern of abuse and creates a reasonable doubt as to Mr. Gennetten's guilt for second degree murder. *See Anderson*, 66 S.W.3d at 775 (stating " ' "movant, when challenging a conviction, must show there is a reasonable probability that, absent the alleged error, the fact finder would have had a reasonable doubt respecting guilt." ' ") (quoting *State v. Clark*, 925 S.W.2d 872, 878 (Mo.App.1996) (internal citations omitted)). Finally, if Dr. Sharp is called to testify at trial, the jury, as trier of fact, would be free to believe his trial testimony over his deposition testimony. Thus, Mr. Gennetten was prejudiced by trial counsel's failure to investigate and call Dr. Sharp.

Because this court finds that Mr. Gennetten's trial counsel was ineffective for failing to investigate and call Dr. Sharp, the judgment denying his post-conviction motion is reversed, the conviction and sentence are vacated, and the cause is remanded for a new trial. Because the other issues raised in Mr. Gennetten's appeal are unlikely to occur on retrial, they will not be addressed.

All concur.