

# In the
# Missouri Court of Appeals
## Western District

**ERICK E. BECKETT,**
             **Appellant,**

                                                      **WD85222**
                                         **OPINION FILED:**
                                          **July 18, 2023**

**v.**

**STATE OF MISSOURI,**
             **Respondent.**

### Appeal from the Circuit Court of Cass County, Missouri
The Honorable William B. Collins, Judge

Before Division Four:  Gary D. Witt, Chief Judge, Presiding, Lisa White Hardwick, Judge, Kevin D. Harrell, Special Judge

Erick Beckett ("Beckett") appeals the judgment of the Circuit Court of Cass County, Missouri ("motion court"), denying his amended motion to vacate, set aside, or correct the judgment and sentence, pursuant to Rule 29.15,[1] following an evidentiary hearing.  On

---

[1] All rule references are to Missouri Court Rules (2021), unless otherwise indicated.

appeal, Beckett argues the motion court erred in denying his amended motion because Beckett's trial counsel ("trial counsel") was ineffective in failing to investigate and call at trial a firearms expert witness to support Beckett's defense. We reverse the judgment of the motion court, vacate the conviction and sentence, and remand for a new trial.

**Factual and Procedural Background[2]**

On February 23, 2013, Beckett called 911 to report that he had shot his wife ("Victim") a couple of times at their home. Police responding to the call found Victim lying on the bed in the master bedroom with her head in a pool of blood. The police also found a Smith and Wesson handgun (containing a live cartridge) and two more cartridges (one live and one spent) on the bed near Victim's head. Emergency response personnel initiated life-saving procedures at the scene, but Victim was pronounced dead shortly after arriving at the hospital. Beckett was indicted on two charges--murder in the first degree, [section 565.020,[3]] (count I) and armed criminal action, [section 571.015,] (count II).

\*     \*     \*

At trial, Beckett testified that he routinely carried his handgun with him around the house and that the gun was always within his or Victim's reach. In the early morning hours of February 23, 2013, after a conflict with Victim that ended in their bedroom, Beckett went to clear and secure the handgun, which Victim had dropped on the bed, but when Beckett jerked the gun off the bed, it fired in his hand. He grabbed the handgun again, and it kicked and fired again. Beckett called 911 and stayed with Victim until the police arrived, and Beckett was taken into custody. He testified that he did not mean to shoot Victim and that it was an accident.[4]

The medical examiner who performed the autopsy on Victim testified at Beckett's trial on behalf of the State. The medical examiner found two gunshot entrance wounds--one on Victim's right forehead and the other on the left side of her neck--and one exit wound on her back from the bullet that entered her neck. Both shots were fired from fewer than three feet away from Victim. The shot to Victim's forehead caused extensive damage to her brain and was fatal. The medical examiner declared the cause of death to be

---

[2] The factual background is taken in large part from this Court's opinion on direct appeal without further attribution. *State v. Beckett*, 540 S.W.3d 881 (Mo. App. W.D. 2018).

[3] All statutory references are to Revised Statutes of Missouri (2000), as updated by supplement as of February 23, 2013, unless otherwise indicated.

[4] Beckett's testimony at trial was consistent with his statement to police the night of the shooting.

multiple gunshot wounds and the manner of death to be homicide. He testified that, in cases involving accidental shootings, there is usually a single gunshot wound; after performing more than 4,000 autopsies, he could not recall ever "call[ing] a multiple gunshot wound an accidental matter."

A firearm forensic expert, [Kathy May ("May"),] called to testify by the State, said she tested the handgun involved in the shooting and determined that it was functioning properly. She indicated that the gun was equipped with both a trigger safety to prevent the gun from firing accidentally and a firing pin safety. She also testified that, during testing, the gun fired only once per trigger squeeze, and the trigger pull, *i.e.*, the pounds of pressure needed to move the trigger rearward, was eleven pounds. She concluded that, even if picked up by the trigger, the gun would not fire accidentally because the heavy trigger pull acted as a third safety.

In addition to eliciting evidence throughout the trial about the two shots, the State emphasized the issue during its closing argument. The prosecutor stated that the fact that Victim was shot twice proved the shooting was intentional. He said, "[t]he truth is two shots equals homicide. Now, two shots is important here. Two shots."

With respect to count I of the indictment, the jury received instructions on lesser included offenses ranging from murder in the first degree to involuntary manslaughter in the second degree. The jury found Beckett guilty of first-degree murder and armed criminal action. Beckett waived jury sentencing, and the trial court sentenced Beckett to concurrent terms of life without parole and thirty years' imprisonment. This Court affirmed the judgment of conviction in *State v. Beckett*, 540 S.W.3d 881 (Mo. App. W.D. 2018).

Beckett filed a motion to vacate, set aside, or correct the judgment and sentence pursuant to Rule 29.15, and, after a finding that appointed counsel abandoned Beckett by failing to timely file an amended motion, newly appointed counsel filed a timely amended motion. As relevant to this appeal, the amended motion alleged that trial counsel was ineffective in failing to conduct an adequate investigation and failed to present a firearms expert witness that would testify that the gun at issue was capable of discharging shots

3

accidentally. The motion court conducted an evidentiary hearing at which Beckett, trial counsel, and a firearms expert, David Kingsbury ("Kingsbury") testified.

Kingsbury did not examine the firearm at issue in this case but relied on the testimony from the witnesses at trial, the exhibits, and the medical examiner's report to reach his conclusions. Kingsbury testified that Beckett's trial testimony that he did not mean to shoot Victim was plausible, and none of the evidence was inconsistent with Beckett's testimony as to how the shooting occurred. Kingsbury disagreed with the State's expert witness's trial testimony that the firing of two shots necessarily indicates the shooting was intentional.

Kingsbury testified that the events leading up to the shooting, as described by Beckett, in which Beckett and Victim were involved in a domestic dispute involving alcohol while a gun was present, is a common background scenario often seen in unintentional shootings. Beckett testified that he and Victim had been in an argument that evening and twice Victim had placed the loaded gun against his head threatening to shoot him. When Victim dropped the gun onto the bed and "flopped down", Beckett grabbed the gun and that is when it discharged twice. Kingsbury testified that the altercation between Beckett and Victim could have led to a state of stress in Beckett that could have reduced his fine motor control. Kingsbury concluded that Beckett's account of the first shot was plausible, in that Beckett could have reached for the loaded weapon on the bed in an attempt to clear and secure the gun, and in the process, Beckett could have placed his finger on the trigger as he was grabbing it and exerted enough force on the trigger to unintentionally

4

discharge the weapon.[5]  Kingsbury also concluded that Beckett's account of the second shot was plausible, in that the recoil and sound from the first shot could have led to shock resulting in an involuntary muscle contraction while Beckett was trying to regain his grip on the gun, which has been documented to result in unintentional discharges.

Regarding the factors that contribute to unintentional discharges, Kingsbury testified that trigger travel, meaning the distance the trigger needs to be pulled in order to release the firing mechanism and discharge the round in the chamber, is an important consideration.  Here, the gun involved in the incident, a Smith & Wesson enhanced Sigma series, had a shortened trigger pull relative to the original Sigma series.  The State's firearm expert witness, May, did not discuss trigger travel at trial.  Although the trigger pull on the weapon was measured at eleven pounds, Kingsbury testified that Beckett's physical condition at the time of the shooting could overcome the trigger pull with his index finger during a gross motor movement which Beckett described.  Kingsbury discussed one particular study which found in testing that 6.25% of involuntary contractions of the trigger finger met or exceeded twelve pounds.

Kingsbury also reviewed police reports regarding the crime scene, specifically the location of the spent cartridges or casings, and concluded that the position of the spent cartridges relative to the mechanics of the weapon were consistent with the weapon being discharged in a sideways position or horizontal plane during the first shot, which aligns

_____

[5] The weapon at issue was a Smith and Wesson semi-automatic handgun.  Each time the trigger is pulled a round is fired and the empty casing or spent cartridge from that round is automatically ejected from the gun to the right side and a new round is automatically moved into the chamber firing position.  A single round would be fired with each separate pull of the trigger but the gun could be fired as quickly as the trigger is pulled.

with Beckett's account that the gun fired while he was picking it up from the bed. With the gun sideways, the spent cartridge being ejected from the gun would have gone up in the air rather than sideways, resulting in the spent cartridge landing on the bed (where one of the spent cartridges was found) rather than off to the side. As the gun discharged the second time, if it was moved into a vertical position, the spent cartridge from the second round would have been ejected to the right side, landing to the side of the bed (where another one of the spent cartridges was found). Further, the distance between the spent cartridges, eight feet, supports Beckett's testimony that the weapon was in a significantly different position during the second shot than the first shot. Kingsbury testified that, based on his review of the evidence, there is nothing that would rule out that this was an unintentional discharge.

Kingsbury also testified that he disagrees with the medical examiner's testimony that the fact that multiple shots were fired necessarily indicates the shooting was intentional. Kingsbury testified that the published literature regarding unintentional discharges establishes that unintentional discharges can involve more than one shot. Kingsbury also disagreed with May regarding the safety features on the weapon. May testified that the weapon had three safeties: a mechanical trigger safety, a mechanical firing pin safety, and the eleven-pound trigger pull acted as a third safety. Kingsbury disagreed with May that the eleven-pound trigger pull constitutes a safety device. Regarding the other two mechanical safeties, Kingsbury testified that the safety mechanisms were designed to keep the weapon from discharging when dropped or hit against a solid surface and would not prevent an unintentional discharge if the manual safety mechanism was inactivated first and the trigger was pulled. According to Kingsbury, the safety

6

mechanisms described by May are not designed to prevent unintentional discharges resulting from the trigger being pulled if the manual safety mechanism is not activated.

Kingsbury did not indicate any expert opinion that the firearm could have malfunctioned in any way causing the discharge. Kingsbury also testified that nothing in his findings could rule out the possibility that the discharge of the weapon was intentional. His expert opinion was that Beckett's testimony as to how the shooting occurred was plausible. "That is -- that is my central opinion regarding -- my central opinion is that his account is plausible, that he -- his account describes a scenario in which there was an elevated risk of unintentional shooting, and that his description accounts for necessary and sufficient conditions for an unintentional shooting. I've also identified inaccuracies in the testimony of the medical examiner and the State's firearms expert regarding intent."

Prior to trial, trial counsel requested two continuances to consult with expert witnesses. In July 2015, trial counsel requested a continuance of the trial date because he was looking at retaining an expert. Regarding experts, trial counsel stated, "I have already started the process of sharing some information with those folks. I don't know whether they are going to give me anything that I am going to want to use, but there are some issues that I have specific questions about that I am not-- I guess satisfied with the State's witnesses." Again, in August 2015, trial counsel requested a further continuance to "come up with some expert information." He stated at that time regarding potential experts, "I am just looking at two and I have been talking with two, but I don't know whether I am going to call them yet or not."

At the evidentiary hearing, trial counsel testified that he did some research on firearms during his preparation for trial. He also contacted a local gun shop to discuss the firearms issues in the case where he spoke to a gunsmith that he had used as an expert in a prior case. When asked why he stopped his investigation after calling a gun shop, trial counsel answered, "I don't have a good excuse why or reason why. Yeah. I don't -- certainly, after seeing how the trial played out, I wish I had."

The motion court issued findings of fact, conclusions of law, and judgment denying Beckett's amended motion. As relevant to this appeal the motion court found that Beckett failed to present evidence that Kingsbury would have testified at trial regarding accidental shootings because Kingsbury's testimony described unintentional shootings rather than accidental shootings. The motion court also found that Kingsbury did not perform any testing on the firearm that was used in the shooting. Further, the motion court found that trial counsel's decision not to call a firearms expert was reasonable trial strategy because trial counsel would not have wanted to put forth another expert who would state that the gun was operating correctly. And the motion court concluded that Beckett was not prejudiced because Kingsbury's testimony would not have completely supported the defense theory that Beckett's gun accidentally discharged. This appeal follows.

**Standard of Review**

Appellate review of a denial of a Rule 29.15 motion is limited to determining whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(k). The motion court's findings and conclusions are clearly erroneous only if, after

a review of the entire record, the appellate court is left with a definite and firm impression that a mistake has been made. *State v. Ervin*, 835 S.W.2d 905, 928 (Mo. banc 1992).

**Analysis**

Beckett argues, in a single point relied on, that the motion court clearly erred in denying his amended motion because trial counsel was ineffective in failing to investigate and call a firearms expert to testify at trial to support his defense, in that Kingsbury's testimony supported the claim raised in the amended motion and the defense's theory at trial; trial counsel's investigation regarding an expert witness was objectively unreasonable; Kingsbury's testimony would have been admissible at trial; Kingsbury's testimony was not cumulative to Beckett's testimony at trial; and Beckett was prejudiced by trial counsel's deficient performance.

In a claim of ineffective assistance of counsel, the movant must show that trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish the performance prong, Beckett must "overcome a strong presumption that [his] counsel provided competent assistance." *Deck v. State*, 68 S.W.3d 418, 425 (Mo. banc 2002). Prejudice occurs where "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Beckett must satisfy both the performance prong and the prejudice prong of the *Strickland* test in order to prevail on a claim of ineffective assistance of counsel.

Beckett argues that trial counsel was ineffective in failing to investigate a firearms expert to call as an expert witness at trial. Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* While the duty to investigate does not require counsel to "scour the globe on the off-chance something will turn up," counsel does have a duty to conduct a reasonable investigation. *Johnson v. State*, 388 S.W.3d 159, 165 (Mo. banc 2012).

Here, trial counsel's failure to further investigate a firearms expert was unreasonable. The defense strategy at trial rested entirely on the argument that Beckett did not intend to shoot Victim. Beckett testified that Victim had pointed the gun at his head twice during an argument, and after Victim dropped the gun on the bed, Beckett "darted [his] hand" and "jerked the gun off the bed." Beckett testified that as he picked up the gun, it discharged. After it fired once, the gun "kicked in [his] hand and [he] grabbed it to keep ahold of it to keep from dropping it, and it fired again." Beckett never asserted that the gun malfunctioned, rather he testified that he pulled the trigger unintentionally each time the gun discharged. Trial counsel's closing argument highlighted this fact, in which he conceded that Beckett was an irresponsible gun owner, in that Beckett and Victim routinely carried the loaded gun around the house with them, but trial counsel argued that the shooting was an accident and that it was not premeditated. Because trial counsel chose this strategic defense, it was unreasonable to not investigate a firearms expert to verify the

11

plausibility of Beckett's account of the events of that evening. *See Cravens v. State*, 50 S.W.3d 290, 295 (Mo. App. S.D. 2001).

Regarding trial counsel's investigation, trial counsel testified at the evidentiary hearing that he called a local gun shop and "did some research on [his] own," but he did not investigate a potential witness with Kingsbury's qualifications to discuss unintentional shootings. When asked why he stopped his investigation after calling a gun shop, trial counsel answered, "I don't have a good excuse why or reason why. Yeah. I don't -- certainly, after seeing how the trial played out, I wish I had." Further, trial counsel was aware that the State intended to call a firearms expert, May, to testify, and trial counsel knew from the discovery that May intended to testify that the evidence supported the State's argument that the shooting was deliberate. In addition, the discovery showed that the medical examiner would testify that the discharge of the weapon more than one time establishes that this was an intentional shooting. A reasonably competent attorney would have investigated the veracity of May's and the medical examiner's testimony by at least consulting with another firearms expert. Trial counsel's failure to investigate the plausibility of Beckett's account and the strength of May's and the medical examiner's testimony was unreasonable and constitutionally deficient. *See id.* ("Counsel's failure to investigate the propriety of obtaining expert witnesses to testify to the distance from which the shot was fired was unreasonable and fell below the customary skill and diligence of a reasonably competent attorney.").

To show ineffective assistance by failing to locate and present expert witnesses, Beckett has the burden to show such experts existed at the time of trial, that they could

12

have been located through reasonable investigation, and the testimony would have benefitted the defense. *State v. Johnson*, 968 S.W.2d 686, 696-97 (Mo. banc 1998). Beckett meets this burden. Kingsbury testified that he has worked as an expert on firearms and firearms safety and has testified in four other cases on behalf of defendants in Missouri courts. Trial counsel testified that had he investigated further, he is confident that he would have applied for and been granted the trial expenses through the public defender's office to hire a firearms expert witness to testify at trial.

Further, Kingsbury's testimony would have benefitted the defense at trial. As noted above, Beckett's entire defense was that he did not mean to shoot Victim and that he unintentionally squeezed the trigger while attempting to grab, secure, and clear the gun. Kingsbury's testimony would have provided expert witness opinion that Beckett's account of the incident was plausible, in that unintentional shootings can occur when an individual is in an excited state and that multiple shots can be fired during an unintentional shooting. Kingsbury also testified that all of the physical evidence was consistent with Beckett's statement to the police the day of the shooting and his testimony as to how the shooting occurred at trial. According to Beckett's testimony, he grabbed the gun following a domestic dispute with Victim as it lay on its side on the bed. Kingsbury testified that as Beckett grabbed the gun, he could have exerted enough force on the trigger, while having reduced fine motor control from his excited state, to fire the gun. Kingsbury's testimony also supports the defense's theory that the second shot could have unintentionally occurred due to shock from the recoil and sound of the first shot as Beckett attempted to secure his grip on the weapon. Kingsbury's testimony included a review of the crime scene,

13

specifically an analysis of the positioning of the spent cartridges, one of which, according to Kingsbury, was consistent with the gun being fired in a horizontal position. Kingsbury opined that this is consistent with Beckett's testimony that the gun discharged while he grabbed it from the bed.

Expert witness testimony could have additionally benefitted Beckett's defense by refuting testimony from the State's expert witnesses. *See Gennetten v. State*, 96 S.W.3d 143, 149-50 (Mo. App. W.D. 2003). In *Gennetten*, this Court held that the proffered testimony from a witness that trial counsel failed to call at trial would have benefited the defendant by contradicting the State's witness's testimony. *Id.* There, the treating physician of a child who was killed by third-degree burns would have testified that "her burns were accidentally inflicted and were not consistent with an intentional injury." *Id.* at 149. This testimony would have contradicted the State's expert's testimony that the child's autopsy findings showed that the burns were intentionally inflicted. *Id.* at 149-50.

Here, similarly, Kingsbury disagreed with the State's expert witnesses on several key issues, specifically the prevalence of unintentional shootings involving multiple shots and the safety mechanisms on the gun used in the incident. Contrary to May's testimony, Kingsbury testified that the safety mechanisms on the Smith and Wesson sigma series would not have prevented an unintentional shooting as described by Beckett, and he disagreed with the State's expert that the eleven-pound trigger pull acted as a third safety. Kingsbury also testified to the importance of trigger travel in an unintentional shooting, which May's testimony lacked. If believed, this testimony would have aided Beckett in his defense theory of an unintentional shooting by undermining the State's theory that Beckett

14

intentionally shot Victim. *See Gennetten*, 96 S.W.3d at 149 ("[The expert's] testimony would have undermined the State's theory that [defendant] engaged in a pattern of abuse against [victim] and, as such, would have provided a viable defense to the intent element of the second[-]degree murder charge.").

Having found that trial counsel's conduct fell below an objective level of reasonableness, Beckett must next show that this deficiency prejudiced him. Beckett must show, in the absence of trial counsel's errors, there is a reasonable probability that the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "As presented, the issue is the effect that the expert testimonial evidence would have had on the jury if it had been presented at trial with regard to guilt of [first] degree murder." *Cravens*, 50 S.W.3d at 296. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Section 565.020. In making this determination, we must consider the totality of the evidence before us. *Strickland*, 466 U.S. at 695. While some factual findings will have been unaffected by errors, "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695-96. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

Here, Beckett's guilt of the offense of first-degree murder was supported by testimony from the arriving officers at the scene of the crime, the medical examiner who performed the autopsy on Victim and testified regarding the anatomical positions of the

bullet wounds, and May's testimony regarding the mechanics of the weapon. There were no eyewitnesses to the shooting other than Beckett. The State's case as to Beckett's act of pulling the trigger was undisputed, and even Beckett admitted to pulling the trigger during his testimony. The State's case as to the required mental state for first-degree murder primarily focused on the mechanics of the weapon, specifically the eleven-pound trigger pull, multiple shots, and how Beckett's account of the incident was extremely unlikely. Regarding the jury instructions for the mental state for first-degree murder, the prosecutor at closing argument stated, "Second, the defendant knew his conduct was practically certain to cause the death of [Victim]. Now, the practically certain knew his conduct, this knowing element, it took 11 pounds, ladies and gentlemen, 11 pounds on the trigger to pull it. That's not some hair-trigger, it doesn't just go off, you have to know. And what's more, he didn't just accidentally squeeze it once, he accidentally squeezed it twice."

The State's theory as to Beckett's mental state, that he "knowingly caus[ed] the death of another person after deliberation upon the matter," section 565.020, could have been undermined through expert witness testimony regarding unintentional shootings and the plausibility of Beckett's account of how the shooting occurred. If the jury in Beckett's case had the expert witness testimony of Kingsbury, or a similar expert, before it, the inferences drawn from the evidence may have changed. Similar to *Cravens*, "the jury may have believed [Beckett's] claims entirely and disbelieved certain prosecution witnesses." 50 S.W.3d at 297. The jury may have inferred that Beckett was in a heightened state of excitement due to the domestic dispute and having the gun placed twice against his head, and that while in this state, he grabbed the weapon recklessly and accidentally squeezed

16

the trigger while attempting to secure the gun. The jury could have further inferred that the position of the spent cartridges was consistent with the gun being fired in two different positions during the two shots, specifically that the first shot occurred while the gun was in a horizontal plane as Beckett was grabbing it off the bed. This would result in the ejected cartridge going up in the air and coming down on the bed rather than being ejected to the side of the bed.

Moreover, Kingsbury's testimony could have cast doubt on the State's expert witnesses, whose testimonies went uncontradicted. Trial counsel attempted to discuss the experts' testimonies during closing argument, but absent the testimony of his own firearms expert, he struggled to tie their testimonies to the defense's theory. Beckett lacked the benefit of an expert witness to corroborate his account or contradict the testimonies of the State's experts. It is also significant that the jury received instructions on lesser included offenses ranging from murder in the first degree to involuntary manslaughter in the second degree. Expert witness testimony regarding the possibility of an unintentional discharge may have affected the outcome regarding one of the lesser degrees of homicide which were submitted to the jury. *See Cravens*, 50 S.W.3d at 298 (citing *Lyons v. State*, 39 S.W.3d 32 (Mo. banc 2001)). While trial counsel's failure to investigate a firearms expert and call him as a witness may not have changed the result, "that very real probability cannot be ignored, and meets the minimum standard of undermining confidence in the outcome of the case." *Perkey v. State*, 68 S.W.3d 547, 552 (Mo. App. W.D. 2001) (quoting *Moore v. State*, 827 S.W.2d 213, 215 (Mo. banc 1992)).

17

The motion court's judgment denying Beckett's amended motion contained several findings of fact and conclusions of law that Beckett challenges on appeal. The motion court found that Beckett failed to show that Kingsbury would testify regarding accidental shootings, a point the State emphasizes on appeal. Beckett's amended motion states:

> [Trial counsel] rendered ineffective assistance of counsel by conduct [sic] adequate investigation--more specifically, consultation with a firearms expert--and failure to present expert testimony from said firearms expert that the gun involved in the shooting was able to discharge shots accidentally.

The crux of the State's argument comes from Kingsbury's testimony regarding the technical distinction between accidental shootings and unintentional shootings. According to Kingsbury, an accidental shooting occurs when the gun operates in a defective manner such that it malfunctions and a discharge of the weapon results. An unintentional shooting, by contrast, occurs when the gun discharges due to human error, such as when an individual inadvertently pulls the trigger while grabbing the gun. Because Kingsbury testified that he could not rule out the possibility of an unintentional shooting, which differed from the language of Beckett's amended motion that the shooting was "accidental," the motion court found that Kingsbury's testimony would not aid Beckett. We disagree. First and foremost, Kingsbury was very clear in his testimony that the distinction between accidental shootings and unintentional shootings is something of significance in the professional literature on firearms safety; it is very common for people who are not part of the profession to use the phrase "accidental shooting" in a broad or generic sense to encompasses a wide range of behavior including both accidental and unintentional shootings.

18

The allegation in Beckett's amended motion, that "the gun involved in the shooting was able to discharge shots accidentally," is consistent with the language that the defense used at trial to argue that Beckett did not mean to shoot Victim. That Kingsbury drew a distinction between the terms "accidental" and "unintentional" is not fatal to Beckett's argument. Trial counsel, the State, and the trial court all consistently referred to Beckett's account of the shooting as "accidental" during trial, even though the correct technical term, according to Kingsbury, would be that the shooting was "unintentional." And trial counsel explicitly stated that the defense was not challenging the functionality of the weapon. For example, the trial court asked the parties, "Is there a dispute as to whether the gun was faulty?" Trial counsel responded, "Not faulty, Judge, but the discharge was accidental, and the pulling of the trigger was accidental. We're not going to get into whether this gun was functional or not."

Beckett also draws this Court to several Missouri cases in which the terms "accidental" and "unintentional" are used interchangeably, even though experts in the firearms industry draw technical distinctions between the terms. *See State v. Hale*, 371 S.W.2d 249, 258 (Mo. 1963) ("An accidental homicide involves an unintentional taking of human life."); *State v. Malone*, 301 S.W.2d 750, 759 (Mo. 1957) ("Self-defense involves an intentional act; an accidental homicide, an unintentional act."); *State v. Bruner*, 541 S.W.3d 529, 538-39 (Mo. banc 2018) (stating that an accident "connotes an unintentional killing."). The motion court's denial of Beckett's amended motion on this basis was clearly erroneous because Beckett alleged that Kingsbury would testify that the gun could discharge accidentally, and Kingsbury testified that he did not find anything that would

19

rule out an unintentional discharge. Although Kingsbury testified that these terms have distinct meanings, Beckett's allegation in his amended motion is consistent with his defense that he did not intend to shoot Victim.

Further, the motion court found that trial counsel exercised reasonable trial strategy when he terminated his investigation into a firearms expert after calling a gun shop because he did not want to "create another expert who would state that the gun used during the offense was operating correctly." This finding is not supported by the record. Trial counsel never testified that he was concerned about calling an expert who would testify that the firearm was functioning properly. Trial counsel testified that he did not have any explanation for his limited investigation into retaining a firearms expert, and the trial court transcript directly contradicts this finding by the motion court. As previously noted, trial counsel never contested the functionality of the weapon or argued that the gun discharged due to a mechanical malfunction. The defense's theory that Beckett did not mean to shoot Victim was based on Beckett's reckless grabbing of the gun, not that the gun malfunctioned. Therefore, trial counsel had no incentive to avoid further testimony regarding the functionality of the weapon because that was never a contested issue. Where trial counsel lacks the information to make an informed judgment because of inadequacies in his investigation, any finding as to trial strategy is inappropriate. *Cravens*, 50 S.W.3d at 295; *see also Clay v. State*, 954 S.W.2d 344, 349 (Mo. App. E.D. 1997) ("An argument based on trial strategy or tactics is appropriate only if counsel is fully informed of facts which should have been discovered by investigation."). Therefore, the motion court's finding is clearly erroneous and unsupported by the record.

20

The motion court also denied Beckett's amended motion because Kingsbury never performed any testing on the actual weapon used in the shooting. However, because Beckett does not contest that the weapon was functioning properly, Kingsbury's examination of the actual weapon would not have provided much value to Beckett's claims. Rather, Kingsbury's testimony was directed toward the plausibility of Beckett's account that he unintentionally pulled the trigger each time the weapon discharged. Kingsbury's testimony relied heavily on literature regarding unintentional shootings and the circumstances that lead to such events. Even if Kingsbury did not examine the weapon involved in the shooting, his testimony at trial could have led the jury to draw different inferences regarding Beckett's mental state when pulling the trigger. To the extent that Kingsbury's analysis did not include an examination of the weapon, it may have detracted from the strength of Kingsbury's testimony compared to May's testimony, but it does not detract from the possibility that the jury could have believed Kingsbury when he testified that Beckett's description of how the shooting occurred was plausible and consistent with the physical evidence.

Regarding prejudice, the motion court found that Beckett was not prejudiced because Kingsbury testified to unintentional shootings rather than accidental shootings, which was the allegation contained in Beckett's amended motion. As was addressed earlier, this is an argument about semantics and is unpersuasive. The motion court found that Beckett was not prejudiced because Kingsbury's testimony would have been inadmissible at trial because it was cumulative. That is, because Beckett himself testified that the

21

shooting was unintentional, any expert witness testimony regarding unintentional shootings would be irrelevant and cumulative to Beckett's testimony. Again, we disagree.

Generally, failure to present evidence that is cumulative to that presented at trial does not constitute ineffective assistance of counsel. *McLaughlin v. State*, 378 S.W.3d 328, 343 (Mo. banc 2012). "Cumulative evidence is additional evidence that reiterates the same point." *State v. Forster*, 616 S.W.3d 436, 448 (Mo. App. E.D. 2020) (internal quotation omitted). However, "not all testimony that restates the factual basis for a criminal defendant's primary defense is 'merely cumulative.'" *State v. Ousley*, 419 S.W.3d 65, 72 (Mo. banc 2013). Evidence is not cumulative "when it goes to the very root of the matter in controversy or relates to the main issue, the decision of which turns on the weight of the evidence." *Black v. State*, 151 S.W.3d 49, 56 (Mo. banc 2004). Further, "[t]he defendant's own testimony on a decisive issue in a case is always received with doubt because of his interest in the result of the case." *State v. Hayes*, 785 S.W.2d 661, 663 (Mo. App. W.D. 1990). Therefore, "[c]orroboration is critical, and corroborative testimony by a single witness can never be discounted as 'merely cumulative.'" *Id.*

Here, Beckett testified that he did not mean to shoot Victim and that the gun discharged as he grabbed it while it lay on the bed. Kingsbury's testimony would not have been cumulative to Beckett's testimony because it constituted expert testimony by someone qualified as an expert "by knowledge, skill, experience, training, or education[.]" *See* section 490.065. Unlike Beckett, Kingsbury could not testify regarding Beckett's mental state at the time of the shooting. Rather, as a firearms expert, Kingsbury reviewed Beckett's testimony and the crime scene investigation and formed an opinion that there was nothing

22

that would rule out the possibility that the shooting was unintentional. Unlike Beckett, Kingsbury could testify to the literature regarding unintentional shootings, including the prevalence of unintentional shootings involving more than one discharge of the weapon; ergonomic factors that lead to unintentional shootings, such as grip strength and trigger travel distance; and disagreement with the State's experts regarding these issues. Beckett's testimony only pertained to his account of the incident without this expert knowledge. Therefore, the motion court's finding that Kingsbury's testimony would be cumulative to Beckett's testimony was clearly erroneous.

Courts will also deny claims of ineffective assistance of counsel where a witness's testimony will be cumulative to another witness's testimony, including testimony elicited by trial counsel on cross examination. *See Rios v. State*, 368 S.W.3d 301, 309 (Mo. App. W.D. 2012). This also applies in the context of a failure to call a firearms expert witness where the possibility of an unintentional shooting was discussed on cross-examination. *See, e.g., United States v. McGill*, 11 F.3d 223, 227-28 (1st Cir. 1993) ("The prosecution's expert was led to concede that the trigger of the murder weapon was so sensitive that it could have been an 'unconscious act' - a concession that defense counsel used to good effect in his summation."). Here, however, Kingsbury's testimony would not have been cumulative to another witness at trial. None of the defense's witnesses, other than Beckett himself, testified to the possibility that the shooting could have been unintentional. Further, trial counsel did not cross-examine May regarding the possibility that the shooting was unintentional. In fact, trial counsel's cross-examination of the State's key witness on firearms was brief. Trial counsel did not question May regarding the claim that the weapon

23

had three safeties, the importance of trigger travel in addition to trigger pull in the context of unintentional shootings, or if May was aware of any incidents of unintentional shootings involving multiple shots. Further, trial counsel did not question May whether she could rule out the possibility that the shooting was unintentional, which was the entire nature of the defense's theory. This rendered the defense with only Beckett's testimony to argue that the shooting was unintentional, which as discussed, is "always received with doubt." *See Hayes*, 785 S.W.2d at 663. Kingsbury's proffered expert testimony would not have been cumulative to Beckett's testimony or to any testimony elicited by the State's witnesses at trial. Further, had trial counsel been aware of the literature regarding firearms which Kingsbury relied on and the opinions of a firearms expert such as Kingsbury, counsel would have had the necessary information to more effectively cross-examine May regarding the possibility that the shooting was unintentional. Accordingly, the motion court's findings and conclusions were clearly erroneous.

Point granted.

## Conclusion

For the foregoing reasons, the judgment of the motion court is reversed. Beckett's conviction and sentence is vacated, and the cause is remanded for a new trial.

_____
Gary D. Witt, Judge

All concur

24